TRANS WORLD AIRLINES, INC.,
Plaintiff-Appellee,

v.

Howard R. HUGHES, Defendant,

and

Hughes Tool Company and Raymond M.
Holliday, Defendants-Appellants.

TRANS WORLD AIRLINES, INC.,
Plaintiff-Appellee,

v.

Howard R. HUGHES and Raymond M.
Holliday, Defendants,

and

Hughes Tool Company, Defendant-
Appellant,

and

The Equitable Life Assurance Society of
the United States, et al., Additional
Defendants-Appellees,

and

Ernest R. Breech, Additional Defendant.

Nos. 150, 151, Dockets 28405, 28406.

United States Court of Appeals
Second Circuit.

Argued Nov. 13, 1963.

Decided June 2, 1964.

John F. Sonnett, New York City (Jerrold G. Van Cise, Paul W. Williams, Dudley B. Tenney, Marshall H. Cox, Jr., Raymond L. Falls, Jr., and William T. Lifland, Cahill, Gordon, Reindel & Ohl, New York City, on the brief), for plaintiff-appellee Trans World Airlines, Inc.

Chester C. Davis, New York City, for defendants-appellants Hughes Tool Co. and Raymond M. Holliday.

Bruce Bromley, New York City (Cravath, Swaine & Moore, New York City, on the brief), for additional defendants-appellees The Equitable Life Assur. Soc. of the United States, Metropolitan Life Ins. Co., James F. Oates, Jr. and Harry C. Hagerty.

William C. Chanler, New York City (Winthrop, Stimson, Putnam & Roberts, New York City, on the brief), for additional defendants-appellees Irving Trust Company and Ben-Fleming Sessel.

Charles L. Stewart, New York City (Dunnington, Bartholow & Miller, New York City, on the brief), for additional defendant-appellee, Dillon, Read & Co.

Chadbourne, Parke, Whiteside & Wolff, New York City, for additional defendant-appellee Charles C. Tillinghast, Jr.

Before LUMBARD, Chief Judge, and KAUFMAN and HAYS, Circuit Judges.

LUMBARD, Chief Judge:

These separate appeals, heard together, are from two orders of the United States District Court for the Southern District of New York in the same case. In the first appeal, No. 28405, the defendants, Hughes Tool Company (Toolco) and Raymond M. Holliday, Toolco's chief financial officer, attack the validity of an order which granted default judgment in favor of the plaintiff, Trans World Airlines, Inc., because of the defendants' failure to produce Toolco's managing agent, Howard R. Hughes, for examination and their failure to produce certain papers and documents, 32 F.R.D. 604 (S.D.N.Y.1963). In the second appeal, No. 28406, Toolco attacks an order which dismissed with prejudice its first five counterclaims against TWA and a group of additional defendants and an order of the same date which granted summary judgment in favor of TWA on the sixth counterclaim.

TWA's complaint charged the defendants with a variety of violations of the antitrust laws as well as with having committed willful and malicious injury to TWA's business, and sought divestiture of Toolco's interest in TWA, injunctive relief, and money damages, trebled with respect to the antitrust violations. On May 3, 1963, Judge Metzner ordered the entering of a default judgment in favor of TWA against Toolco [1] but referred to a special master the issue of damages, on TWA's claim of $35,000,000 which the antitrust statute would

---

1. Due to the relationship of the parties, the district court accepted the election of defendant Holliday, an officer and director of Toolco, to be bound by Toolco's decision to forego further discovery proceedings.

treble, and retained for further consideration the question of divestiture. Judge Metzner did certify under 28 U.S.C. § 1292(b) that immediate appeal was justified inasmuch as a controlling question of law was involved and hearings on the question of damages might be prolonged. We granted leave to appeal limited to two questions: first, whether the district court lacked jurisdiction of the treble damage action by reason of primary jurisdiction over these matters residing in the Civil Aeronautics Board; and second, whether the issuance of certain orders by the CAB permitting the defendant to take certain actions constitutes a good defense to the antitrust action. Thus the propriety of the court's entering a default judgment against the defendants with respect to the complaint is not before us and we consider it only in connection with the court's dismissal of the five counterclaims asserted by the defendants. The second appeal is taken as of right from a final judgment which dismissed Toolco's first five counterclaims and granted summary judgment to TWA on the sixth counterclaim.

### BACKGROUND OF THE LITIGATION

An understanding of the issues requires a preliminary statement of certain background facts set forth in the pleadings and which on this record and in view of the default of the defendants we must take as established.

Commencing about five years after TWA was organized in 1934, Toolco, which at all times has been 100 percent owned and controlled by Howard Hughes, began to purchase TWA common stock, and by 1944 it held 45 percent of this stock. By 1958 Toolco had increased to 78 percent its interest in TWA's common stock; from 1944 until December 1960 it nominated a majority of TWA's directors.

Since 1955 the commercial air industry has largely converted to the use of jet aircraft. TWA's competitors began in that year to aid in the development of and to purchase jet planes. Prior to

1955 Toolco had entered into an arrangement with the General Dynamics Corporation (Convair) for the joint development of jet aircraft, but in that year the two companies terminated the arrangement. Toolco had also entered into a plan whereby it would develop and manufacture its own jet aircraft for sale or lease to TWA and its competitors. That plan was abandoned during 1956. During this period, Toolco arranged for the purchase on its own account of jet aircraft from Convair and the Boeing Company, these arrangements providing that Toolco could assign to TWA its rights to such aircraft.

Despite repeated requests by TWA, Toolco refused to assign any planes to TWA during the period 1956 to 1960. The only jet-powered aircraft which the defendants permitted TWA to use during this period were leased on a day-to-day basis by Toolco to TWA during 1959 and 1960 on the condition that TWA would not purchase or lease aircraft from any other potential supplier.

At some time prior to May 1960 Toolco and Atlas Corporation, which owns a controlling stock interest in Northeast Airlines, entered upon a plan to have Northeast propose to TWA a merger of the two air carriers. In November 1960, while the proposed merger plan was pending, Toolco diverted to Northeast six of the Convair jet aircraft which by previous agreement it had assigned to TWA.

The defendants pursued a continuous policy of refusing to permit TWA to undertake equity financing except on the condition that Toolco increase its equity position in TWA; as a result TWA was limited to obtaining funds through debt financing. When in 1960 Toolco and Hughes finally agreed to outside financing for TWA, the cost of such financing had risen greatly and the financing could be arranged only on less favorable terms than had theretofore been available, terms which had been secured by TWA'S competitors. Under the 1960 financing arrangement Toolco's stock in TWA was

placed in a voting trust.[1a] The CAB approved this financing arrangement and the voting trust on December 29, 1960, finding that these arrangements were in the public interest. Thereupon, the Metropolitan Life Insurance Company and the Equitable Life Assurance Society loaned TWA $92,800,000 and a group of banks for which the Irving Trust Company acted as agent loaned TWA $72,000,000. In March 1961 TWA's Board of Directors authorized the purchase of 26 Boeing jet aircraft. Thereafter the defendants continued their attempts to have TWA purchase from Toolco jet aircraft which Toolco had previously agreed to purchase from Convair. The defendants have also continued to press their demand for a merger of TWA and Northeast and have otherwise, despite the existence of the voting trust, attempted to prevent TWA from acquiring jet aircraft other than from Toolco.

THE FIRST APPEAL—Docket No. 28405

TWA's complaint alleges that the facts heretofore stated constitute violations of the Sherman and Clayton antitrust acts, insofar as the defendants have attempted to monopolize a substantial segment of interstate and foreign commerce and trade, have required that TWA boycott all suppliers of aircraft other than Toolco, and have agreed to provide financing and to sell aircraft to TWA on the condition that TWA not purchase or lease the goods of a competitor. The defendants assert that the Civil Aeronautics Board possesses primary jurisdiction over these matters and in the exercise of its powers has approved all of the transactions alleged in the complaint and thereby immunized the defendants from the operation of the antitrust laws. Judge Metzner held that nothing in the Federal Aviation Act precludes the district court from asserting jurisdiction in this case and that the CAB's approval of various transactions between TWA and Toolco did not confer immunity upon the defendants from the operation of the antitrust laws. We agree.

█ The proposition has so often been stated that it has become hornbook law that immunity from the operation of the antitrust laws is not lightly to be inferred from the enactment of a regulatory statute. See Georgia v. Pennsylvania R. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945). Yet Congress may effect such a design through explicit enactment of an immunizing provision, and Congress has done so on occasion.[2] Under § 408(a) (6) of the Federal Aviation Act, 49 U.S.C. § 1378(a) (6), no person engaged in any phase of aeronautics[3] may lawfully acquire control of any air carrier without the prior approval of the CAB. Section 411 empowers the Board to order any air carrier to cease and desist from "unfair or deceptive practices or unfair methods of competition." Section 414 of the Act provides that any person affected by any order made under § 408[4] "shall be, and is hereby, relieved from the operation of the 'antitrust laws' * * * and of all other restraints or

---

1a. The commitments of the various lending institutions had been conditioned upon the continuation of satisfactory TWA management. The lenders reserved the right to insist upon a voting trust during the term of the loan in the event of a change in TWA management which they deemed to be adverse to TWA's credit position. When Charles Thomas abruptly resigned as president of TWA in July 1960 the lenders offered to effect the transaction if Toolco agreed to place its stock in TWA in a voting trust. In December 1960 Toolco executed the voting trust agreement.

2. See, e. g., Clayton Act § 16, 38 Stat. 737 (1914), 15 U.S.C. § 26 (1958); Shipping Act § 15, 39 Stat. 734 (1916), 46 U.S.C. § 814 (1958); Interstate Commerce Act § 5a(9), 62 Stat. 473 (1948), 49 U.S.C. § 5b(9) (1958).

3. In Transcontinental & Western Air, Inc., Control by Hughes Tool Compay, 6 C.A.B. 153 (1944), the Board determined that Toolco was engaged in a phase of aeronautics and thus subject to Board action under § 408.

4. Section 414 applies to 49 U.S.C. § 1379 (interlocking relationships) and 49 U.S.C. § 1382 (pooling and other agreements) as well as to § 408.

prohibitions made by, or imposed under, authority of law, insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order."

In attempting to ascertain the extent of the antitrust immunity conferred by the Aviation Act we do not explore wholly uncharted territory. In Pan American World Airways, Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963) (Panagra), a case upon which all parties in this litigation principally rely, the Supreme Court considered the extent to which the Aviation Act has granted the CAB jurisdiction over matters involving the commercial aviation industry which might otherwise constitute antitrust violations.

Pan American, a major airline in interstate and foreign commerce, and W. R. Grace & Co., a common carrier, were charged in a civil action brought by the United States with violations of the antitrust laws arising from their relations with Panagra, an airline which had been formed by Pan American and Grace, each of which owned 50 percent of its stock. The government's complaint alleged restraints of trade in that Pan American and Grace had agreed that Panagra would have the exclusive right to traffic along the west coast of South America free of Pan American competition and that Pan American would enjoy the exclusive right to traffic in other areas in South America and between the Canal Zone and the United States; that Pan American and Grace had conspired to monopolize and did monopolize air commerce between the eastern coastal areas of the United States and western coastal areas of South America and Buenos Aires; and that Pan American had exercised its 50 percent control over Panagra to prevent it from securing authority from the CAB to extend its service from the Canal Zone to the United States.

The district court found a single violation in Pan American's activities with regard to the extension of Panagra's routes and ordered divestiture of Pan American's stock interest in Panagra. On direct appeal from the district court, the Supreme Court reversed the lower court judgment on the ground that the questions presented by the government's complaint had been entrusted to the CAB and the district court therefore lacked jurisdiction in the premises.

Noting that those aspects of antitrust problems entrusted to the Board are "but a fraction of the total," the Court emphasized that the limitation of routes, the division of territories, and the relation of common carriers to air carriers are "basic to [the] * * * regulatory scheme" of the Federal Aviation Act and that the acts charged in the government's complaint are "precise ingredients of the Board's authority." The term "unfair methods of competition" in § 411, the Court noted, must gather meaning from the context of the regulatory scheme envisioned in the Act, and it would be strange if the "public interest" standard incorporated into § 411[5] was deemed

---

5. Title 49 U.S.C. § 1302 provides:

"In the exercise and performance of its powers and duties under this chapter, the Board shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity:

"(a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

"(b) The regulation of air transportation in such manner as to recognize and preserve the inherent advantages of, assure the highest degree of safety in, and foster sound economic conditions in, such transportation, and to improve the relations between, and coordinate transportation by, air carriers;

"(c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;

"(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and

satisfied by the Board as to a particular transaction and yet that transaction was violative of the antitrust laws; it would be equally strange for a transaction approved under § 408 by the Board to be adjudged subsequently to be in violation of the antitrust laws.

■ The striking dissimilarities between the operative facts in Panagra and those in the instant case as well as the whole tenor of the Supreme Court's opinion compel us to the conclusion that the district court properly asserted jurisdiction in this cause. The relationship between the allegedly unlawful activities in Panagra and the scope of the Board's powers to deal with such activities was direct. Under 49 U.S.C. § 1371, it is the specific function of the CAB to certify airlines to operate on a particular route between terminal points directed by the Board. The unlawful division of territories and allocation of routes with which Pan American, Grace and Panagra were accused were. therefore directly within the ambit of powers explicitly granted the Board by the Congress. To permit the courts to intrude into this area would have been, as the Court noted, to permit the erection of an independent yet parallel body of law in direct contravention of the regulatory scheme embodied in the Aviation Act.

By contrast, in the instant case TWA's complaint alleges transactions which are unrelated to any specific function of the CAB. The Board is explicitly entrusted with the duty of considering for approval any potential acquisition of control over an air carrier by a person engaged in any phase of aeronautics; and to the extent of such approval—but only to that extent—the Act grants immunity from the operation of the antitrust laws. Surely Congress did not contemplate that CAB approval of an acquisition would be tantamount to approval of every transaction which might be entered into by the controlling party. The focus of the Board's powers in this sphere is the acquisition itself rather than the broad range of activities into which the controller may enter thereafter. Thus the plaintiff's complaint enumerates a variety of transactions over which the Board is given no explicit jurisdiction by the Act: an attempt to monopolize a substantial segment of interstate and foreign air commerce, imposition by the defendants on TWA of the condition that the airline not purchase or lease aircraft from any supplier other than Toolco, and the tying of financing of aircraft acquisitions with the purchase of such aircraft from Toolco.

Nowhere in the Act is the Board specifically charged with the duty of monitoring each transaction which is ultimately effected between the carrier and its controller once an acquisition is approved. The Board concededly may condition its approval of a control acquisition upon such terms as it may find to be just and reasonable, and thereby retain a continuing jurisdiction over the activities of the controlling party.[6] In the exercise of this supplementary power the Board may investigate and regulate certain aspects of transactions effected between an air carrier and the controlling party. But the existence of this power— which was employed in approving Toolco's acquisition of control over TWA— hardly supports the defendants' claim that Congress placed the regulation of everything which might flow from such transactions within the exclusive juris-

domestic commerce of the United States, of the Postal Service, and of the national defense;

"(e) The promotion of safety in air commerce; and

"(f) The promotion, encouragement, and development of civil aeronautics."

6. Section 408, provides, in pertinent part: "Unless, after such hearing, the Board finds that the consolidation, merger, pur-

chase, lease, operating contract, or acquisition of control will not be consistent with the public interest or that the conditions of this section will not be fulfilled, it shall by order approve such consolidation, merger, purchase, lease, operating contract, or acquisition of control, upon such terms and conditions as it shall find to be just and reasonable and with such modifications as it may prescribe * * *."

diction of the CAB. The issue here is not whether the CAB may consider such matters but rather whether the federal courts have been excluded from their consideration by Congress. There is virtually no limit to the nature and variety of the transactions which fall within this category. In the absence of an explicit congressional mandate entrusting such transactions exclusively to the Board we can find no basis for declaring the federal courts to be without jurisdiction in such matters.

In Panagra the Civil Aeronautics Board could have considered the activities of Pan American under its broad power set out in § 411 of the Act to "investigate and determine whether any air carrier * * * has been or is engaged in unfair or deceptive practices or unfair methods of competition in air transportation * * *," a provision to which the Supreme Court explicitly adverted in holding that the matters there in dispute had been specifically entrusted by Congress to the Board. By contrast, the Board enjoys no such power to deal with the allegedly unlawful activities of Hughes and Toolco, inasmuch as § 411 is applicable solely to "any air carrier, foreign air carrier, or ticket agent." The limited applicability of § 411 merely underscores the limited jurisdiction conferred by Congress upon the Board to deal with the multifarious antitrust problems which may arise in the management and operation of the commercial air industry. Moreover, it is not even clear that the Board any longer possesses any jurisdiction over the activities of Hughes and Toolco, even under § 408 of the Act, inasmuch as the voting trust arrangement adopted in 1960 appears to have ousted Hughes and Toolco from control over the operations of TWA, such control being a prerequisite to the Board's acting under § 408.

We are reinforced in our conclusion by the Supreme Court's recognition of the limitations of its holding in Panagra. Characterizing the questions presented in the government's complaint as "narrow" ones, the Court, as we have noted, emphasized that the antitrust problems entrusted by the Act to the Board "encompass only a fraction of the total." The activities here drawn into issue by TWA's complaint fall without the ambit of that small fraction of antitrust problems placed within the Board's exclusive jurisdiction.

The Aviation Act itself bears testimony that matters such as those with which we are here concerned were not intended to be placed without the competence of the federal judiciary. Title 49 U.S.C. § 1506 declares that "Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." Moreover, the Act fails to empower the Board to grant the very relief principally sought by the plaintiff in this action—the award of money damages, trebled under the mandate of the antitrust laws.

Even if we were to view as the subject of judicial discretion the question whether the CAB is to be given primary jurisdiction in the consideration of activities such as those here alleged, we could find no compelling reason to adopt such a course on the facts presented. While the entire regulatory scheme of the Federal Aviation Act demands that the Board be given great latitude in fashioning public policy with regard to the development of the commercial air industry through the acquisition of control over air carriers—and the Board possesses a substantial expertise in these matters—there is no such necessity for a uniformity of policy with regard to the consideration of the validity of individual transactions effected between an air carrier and its controller which are alleged to be unlawful under the antitrust laws. Nor is the Board any more qualified to consider such charges than the federal courts, which daily encounter and resolve antitrust problems. The disposition of such matters by the courts would not intrude upon the Board's function of fashioning the broad framework of control for the commercial air industry. We

can thus find no warrant for adopting the position that the subject matter of this litigation was entrusted by Congress to the exclusive jurisdiction of the Civil Aeronautics Board.

■ Nor do we find any merit in the defendants' alternative contention that the Civil Aeronautics Board, in approving Toolco's acquisition of control over TWA and certain specific transactions thereafter, immunized the defendants from the operation of the antitrust laws as to all the ramifications of these transactions. Title 49 U.S.C. § 1384 extends such immunity only "insofar as may be necessary to enable such person to do anything authorized, approved or required by such order." As Judge Metzner noted, the Board's approval of acquisition of control by Toolco over TWA did not carry with it approval of every transaction which Toolco might choose to effect in the exercise of its control. To give § 408 such a carte blanche effect would be to pervert the entire regulatory structure of the Aviation Act. Nor can any of the activities with which Toolco stands charged be deemed to have been necessary to the exercise of its control relationship.

In its original grant of approval of the acquisition of control over TWA by Toolco,[7] the Board restricted commercial transactions between the two companies to "transactions involving complete items of property, the price of which does not exceed $200 each, with the further limitation that the total annual expenditure involved in such commercial transactions by either party shall not exceed $10,000." Over the years the Board has occasionally modified this order to permit specific intercompany transactions. In 1959 and 1960 the Board issued five such modification orders approving the specific transactions involving the acquisition of jet aircraft which are the subject matter of this litigation. In each case, however, the Board's order states merely the specific terms of the transaction and none of the accompanying conditions which allegedly were foisted upon TWA.[8] Order No. E–13873, issued on May 15, 1959, for example, states that the modification "is desired to permit TWA to lease on an individual basis up to eleven Boeing 707–131 aircraft from Hughes as they become available, as well as to acquire from Hughes at Hughes' actual cost a supply of spare parts, not to exceed $3,500,000 in value, which are needed for the operation of these aircraft. In addition, modification is requested to permit the lease by Hughes of up to thirty spare jet engines to TWA." The Board stated in its order that the proposed arrangements did not violate the purpose of the original restriction in the control approval and that the modification ordered was just and reasonable and in the public interest; but the Board was careful to emphasize that its action should not be deemed a determination for rate-making purposes of the reasonableness of the transactions. There is no indication whatsoever—or any reason to believe—that the Board had been given any indication of the conditions which had been attached to Toolco's agreements with TWA. The Board's approval extended only to the individual transactions involved in these orders, not to the whole range of activities which over a period of years constituted the backdrop against which these transactions were effected. There is thus no cause to hold that these individual and narrow Board orders immunized the defendants from the operation of the antitrust laws with respect to activities not specifically ruled upon by the Board.

■■ The defendants maintain that in any event the complaint fails to state facts sufficient to establish the jurisdic-

---

7. Transcontinental & Western Air, Inc., Control by Hughes Tool Company, 6 C. A.B. 153 (1944).

8. See Order No. E–13542, February 26, 1959; Order No. E–13873, May 15, 1959; Order No. E–14169, July 1, 1959; Order No. E–14504, September 30, 1959; Order No. E–14877, January 29, 1960.

tion of the district court. They claim that the allegations of antitrust violations in the complaint are wholly conclusory and that the specific transactions alleged to have been effected by the defendants do not state a cause of action under the antitrust laws. We do not agree. We cannot say that the specific transactions alleged in TWA's complaint —that Toolco refused to finance aircraft acquisitions by TWA unless TWA agreed to purchase planes from no supplier other than Toolco; that Toolco required TWA generally to boycott all other suppliers of aircraft; that the defendants have attempted through various means to monopolize a substantial segment of interstate and foreign air commerce—are on their face insufficient to support a claim of antitrust violations, a claim which surely falls within the jurisdiction of the district court. The allegations state the outlines of a tying arrangement, an economic boycott of the defendants' competitors, and an attempt to monopolize commerce, all unlawful under the antitrust statutes. It would be particularly inappropriate to find these allegations insufficient to establish the district court's jurisdiction inasmuch as the defendants denied the plaintiff the right through pre-trial discovery to add more detail and substance to the allegations set forth in the complaint. "[T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed. 2d 80 (1957). See Dioguardi v. Durning, 139 F.2d 774 (2 Cir. 1944) ; Knudsen v. Torrington Co., 254 F.2d 283 (2 Cir. 1958). Of course the Federal Rules apply with equal force to suits under the antitrust laws. Nagler v. Admiral Corp., 248 F.2d 319, 322–23 (2 Cir. 1957). We are satisfied that the complaint sufficiently states a cause of action and establishes the district court's jurisdiction.

## THE SECOND APPEAL—Docket No. 28406

The defendants also appeal, as of right, from orders of the district court which dismissed with prejudice their first five counterclaims asserted against TWA and a group of additional defendants and which granted summary judgment in favor of TWA on a sixth counterclaim, because of the defendants' failure to produce Hughes for examination and their failure to produce certain papers and documents. The additional defendants are the three major lending institutions which participated in the 1960 financing and voting trust agreements, certain of their officers, the incumbent president and chairman of the board of directors of TWA, and an investment banking concern which since early in 1959 has served as TWA's principal financial adviser.

The proper consideration of this appeal requires a chronological exposition of the lengthy and complicated pretrial proceedings engaged in by the parties. Late in 1961 Judge Metzner was assigned to serve as a judge for all purposes in this litigation under General Rule 2, General Rules of the United States District Courts for the Southern and Eastern Districts of New York. By order of February 7, 1962, Judge Metzner confirmed a series of prior orders which had awarded Toolco priority in the conduct of pretrial discovery, and he then appointed J. Lee Rankin, Esq. as Special Master to supervise the conduct of the discovery proceedings.

Shortly after the filing of the answer and counterclaims on February 12, the Special Master granted Toolco's motions to have the additional defendants produce a multitude of documents. On March 5, Judge Metzner modified the February 7 order so as to limit Toolco's priority in discovery to evidence which bore on the plaintiff's claims against Toolco. The March 5 order stated that "The additional defendants may participate in such depositions conducted by plaintiff, in furtherance of their own deposition proceedings, or may separately schedule such depositions to follow

upon the completion of plaintiff's depositions." The court further ordered that upon the completion of the additional defendants' deposition proceedings Toolco could complete its own deposition proceedings.

On February 16, the Special Master had granted the motion of the additional defendants for the production of certain documents by Toolco. Toolco withheld certain of these documents on a claim of attorney-client privilege. After full consideration, the Special Master ordered the production of these documents on April 17. After affirmance by the district court of this order and of a second order to produce issued by the Special Master, and denial of review by this court, counsel for Toolco, in a letter to Judge Metzner on January 23, 1963, declared that Toolco would refuse to comply with any of these orders.

Meanwhile, on September 6, 1962, counsel for Toolco had accepted a subpoena calling for Hughes' personal appearance as a witness returnable on September 24, 1962. The district court later set October 29 as the date for the Hughes deposition. The court went on to adopt as its own a prior decision of the Master that in view of the close connection between Hughes and Toolco, Toolco would be responsible for Hughes' actions with respect to the subpoena, and that if Hughes failed to communicate with the Special Master he would be deemed to have acquiesced in this interpretation. No communication from Hughes was received by the Master.

On October 25, 1962, the Master granted Toolco's motion to adjourn the Hughes deposition, but set February 11, 1963, as a firm date therefor. By order of January 10, 1963, the district court affirmed the setting of this date, stating that "this date will be adhered to in the absence of extraordinary circumstances." Shortly thereafter, Toolco moved to hold the Hughes deposition on written interrogatories and to bring on for hearing its motion, pending since August 8, 1961, to dismiss the complaint for failure to state a claim upon which relief may be granted. On January 19, 1963, the district court denied the first motion.

In preparation for the Hughes deposition, the additional defendants had moved on January 9, 1963, for the production by Toolco of certain income tax returns, revenue agents' reports, accountants' work sheets and other documents which would allegedly substantiate a claim that Toolco and Hughes had been motivated by a desire to reap tax benefits at TWA's expense in their dealings with TWA concerning the acquisition of a jet-powered fleet of aircraft. On January 22, 1963, the Master ruled that the documents were relevant to the issues in the case and that their production would not place an unreasonable burden upon Toolco. On February 1, the district court affirmed the order to produce, but Toolco failed to produce the documents, despite repeated demands by TWA and the additional defendants.

On February 6, 1963, five days before the scheduled Hughes deposition, Toolco filed a complaint with the Civil Aeronautics Board charging the additional defendants with violations of the Federal Aviation Act. On the same day Toolco moved the district court for a stay of all proceedings on the counterclaims pending disposition by the CAB of the Toolco complaint, on the ground that under the Supreme Court's decision in Panagra, filed on January 14, 1963, the Board possessed exclusive jurisdiction over the subject matter of the counterclaims. On February 6 the district court denied Toolco's motion to dismiss the complaint, 214 F.Supp. 106 (S.D.N.Y.1963), and on February 8 it denied Toolco's motion for a stay of all proceedings on the counterclaims.

On February 8 counsel for Toolco informed the district court that Toolco had made a "business decision" not to proceed further with discovery proceedings, but rather to rest on the merits of the positions theretofore taken and seek judicial review thereof. Consequently, counsel for Toolco stated, Hughes would fail to appear for the deposition ordered for February 11. He further stated that

Toolco was aware of the sanctions which could be imposed by the district court for such a willful and deliberate failure to proceed with the scheduled discovery proceedings.

The inevitable consequence of Toolco's default in producing Hughes as a witness and in producing the documents as the court had directed was that on May 3 the district court granted the motions of TWA and the additional defendants for dismissal of the counterclaims with prejudice, under Rule 37(b) (2) (iii) and Rule 37(d) of the Federal Rules of Civil Procedure. From the final judgments entered pursuant to that decision, and from a final judgment entered the same day granting TWA's motion for summary judgment on the sixth counterclaim, Toolco appeals.

Inasmuch as the sixth counterclaim raises issues unrelated to the first five counterclaims, we shall treat the sixth counterclaim separately.

### The First Five Counterclaims

The appellants raise several contentions: first, that the district court should have granted their motion for a stay of all proceedings on the counterclaims pending disposition of the complaint which the defendants had filed with the CAB; second, that the district court should have granted the defendants a voluntary dismissal of the counterclaims without prejudice; and third, that the district court orders which directed Hughes to appear for deposition as noticed by the additional defendants, and which directed Toolco to produce the tax documents and the documents involving the attorney-client privilege, were improper.

■ That there was no cause for granting a stay of all proceedings on the counterclaims appears clear from the nature of these counterclaims. The first counterclaim alleges that the additional defendants and the present management of TWA improperly sought to perpetuate their control over TWA by preventing termination of the voting trust according to its terms. The second charges that Metropolitan and Equitable had acquired control over TWA in violation of § 408 of the Aviation Act. The third counterclaim is brought derivatively on behalf of TWA and asserts that the additional defendants and the present TWA management have conspired in violation of the antitrust laws to monopolize the supplying of financing to air carriers. The fourth restates the allegations of the third counterclaim and alleges that Toolco has suffered damages in excess of $77,000,000. Finally, the fifth counterclaim charges a common law conspiracy to interfere with Toolco's rights as the owner of 78 percent of the stock of TWA and to extend the duration of the voting trust beyond the period permitted by the applicable Delaware statute.

In the light of the views we have above expressed regarding the first appeal, it is plain that all of these counterclaims save the second fall beyond the scope of the CAB's exclusive jurisdiction. They deal with alleged misconduct on the part of the lending institutions in their dealings with TWA and Toolco and in no respect with matters specifically entrusted to the Board in the Act. Acts such as those alleged in all but the second counterclaim may properly be made the subject of an action in a federal district court. Inasmuch as the Board possessed no exclusive jurisdiction as to these claims, the defendants presented no adequate basis for a stay of proceedings.

■ As for the second counterclaim— which alleges a violation by the additional defendants of § 408 of the Aviation Act—the Board clearly possesses exclusive jurisdiction. Under that section, the Board is empowered to investigate alleged violations, and the district court was without power to adjudicate this issue. The court should have dismissed this counterclaim for lack of jurisdiction, and we direct the modification of the judgment below accordingly.

■ The defendants maintain that the district court should have granted a voluntary dismissal without prejudice of the counterclaims. It suffices merely to note

that at no juncture in the proceedings below did the defendants request that the court grant such relief. Indeed, the very purpose for the defendants' "business decision" to terminate all pre-trial discovery was to gain judicial review of the positions which the defendants had taken below.

■ Finally, the defendants contend that the district court's dismissal with prejudice of the counterclaims was invalid because the discovery orders upon which the district court based its order under Rules 37(b) (2) (iii)[9] and 37 (d)[10] were improper.

We think it clear beyond any question, in light of all the circumstances here presented, that the deposition of Hughes was necessary to all aspects of this litigation, and his willful and deliberate default constituted a sufficient basis under Rule 37 for the dismissal of the counterclaims with prejudice. Hughes has at all times been the sole owner of Toolco and the guiding light behind all the transactions between Toolco and TWA. Both TWA and the additional defendants had the right to depose Hughes. Although the defendants contend that the February 11, 1963 deposition was to be held solely for the benefit of TWA, Judge Metzner's order of February 7, 1962 made clear that the additional defendants could schedule separate deposition proceedings of their own, or in the alternative participate in TWA's deposition proceedings. On February 14, 1962, the additional defendants served notices to examine Toolco by Hughes, its managing agent. The additional defendants had the right under Judge Metzner's order to treat as their own the Hughes deposition scheduled for February 11, and it is abundantly clear from the record that they did so.

■ When Hughes chose not to appear for this deposition—which action was taken deliberately and with full knowledge of the sanctions available to the additional defendants under Rule 37 —Judge Metzner was fully justified in entering judgments dismissing the counterclaims against TWA and the additional defendants. The sanction of judgment by default for failure to comply with discovery orders is the most severe sanction which the court may apply, and its use must be tempered by the careful exercise of judicial discretion to assure that its imposition is merited. However, where one party has acted in willful and deliberate disregard of reasonable and necessary court orders and the efficient administration of justice, the application of even so stringent a sanction is fully justified and should not be disturbed. See Nasser v. Isthmian Lines, 2d Cir., 1964, 331 F.2d 124; Link v. Wabash Railroad Co., 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) ; Gill v. Stolow, 240 F.2d 669 (2 Cir. 1957).

9. Rule 37 provides:
   "(b) Failure to Comply With Order.
   "(2) *Other Consequences.* If any party or an officer or managing agent of a party refuses to obey an order made under subdivision (a) of this rule requiring him to answer designated questions, or an order made under Rule 34 to produce any document or other thing for inspection, copying, or photographing or to permit it to be done, or to permit entry upon land or other property, or an order made under Rule 35 requiring him to submit to a physical or mental examination, the court may make such orders in regard to the refusal as are just, and among others the following:
   "(iii) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party * * *"

10. Rule 37 provides:
   "(d) Failure of Party to Attend or Serve Answers. If a party or an officer or managing agent of a party wilfully fails to appear before the officer who is to take his deposition, after being served with a proper notice, or fails to serve answers to interrogatories submitted under Rule 33, after proper service of such interrogatories, the court on motion and notice may strike out all or any part of any pleading of that party, or dismiss the action or proceeding or any part thereof, or enter a judgment by default against that party."

Hughes' deposition was absolutely essential to the proper conduct of the litigation. Yet he and Toolco seized upon every opportunity to forestall this event. To this end they demanded the production of a multitude of documents by TWA and the additional defendants and secured successive adjournments of the deposition. Indeed, Hughes and Toolco seemed to look upon the entire discovery proceedings as some sort of a game, rather than as a means of securing the just and expeditious settlement of the important matters in dispute. It was only at the very eve of the Hughes deposition—after the other litigants had been put to much delay and expense—that the defendants made a "business decision" to terminate discovery.

Hughes' conduct is particularly intolerable in a large and complex litigation such as this one. The protracted antitrust suit taxes the energies and resourcefulness of each party to the litigation; and it consumes much time of the court and the special masters it appoints. Tactics such as Hughes' serve only to frustrate the implementation of the discovery machinery devised by the federal judiciary to expedite the handling of such complex litigation. See Handbook of Recommended Procedure for the Trial of Protracted Cases, Report of the Judicial Conference Study Group on Procedure in Protracted Litigation, 25 F.R.D. 351 et seq. (1960).

In the light of all these circumstances, the district court was not obliged to employ sanctions less severe than the dismissal of the counterclaims with prejudice. Whatever lesser sanctions might have sufficed with regard to the documents withheld by the defendants, it seems to us that a dismissal of the counterclaims was appropriate, in view of Hughes' intransigence after intensive and expensive discovery proceedings already protracted for more than one year.

We are also of the view that the other two discovery orders were properly issued. After careful examination of the documents, both the Special Mas-

ter and the district court determined that the attorney-client privilege claimed by the defendants as to the first group of documents had been waived as the result of the defendants' pleading advice of counsel as a defense and as the result of two affidavits, one of which was submitted to the CAB by Raymond A. Cook, one of Toolco's attorneys. As the Master noted, the Cook affidavit purports to be based upon information received by Cook as Attorney for Toolco and in many respects parallels the allegations made in the answer and counterclaims. The district court properly held that under these circumstances the affidavit constituted a waiver by Toolco of the attorney-client privilege. As for the documents concerning income tax information, there can be little question of the relevance of this material to the litigation. The additional defendants might well have based a defense to the counterclaims upon a showing that Toolco's and Hughes' activities with regard to the financing of aircraft acquisitions by TWA were motivated by a desire to reap income tax benefits for Hughes at the expense of TWA. Of course, the test of relevance for discovery purposes is less stringent than that applied to the admissibility of evidence at trial. Moore, Federal Practice ¶ 34.10. The district court properly ordered the production of the tax documents.

*The Sixth Counterclaim*

The December 1, 1960 financing agreement required the subordination of prior indebtedness of TWA to Toolco, to be achieved through the issuance by TWA of interim subordinated notes in payment *pro tanto* of the prior indebtedness. TWA was then obliged to offer to its stockholders the right to purchase, at least at par, $100 million worth of subordinated debentures. The interest on both the interim notes and the debentures was set at 6½ percent. Toolco agreed to purchase the "principal amount" of the unsubscribed debentures within three business days of the close of the subscription offering. The agreement further provided that "TWA shall * * * refund the Interim Subordi-

nated Notes * * * upon the purchase by Hughes [Toolco] of [the] Subordinated Debentures * * * and Hughes shall accept such Subordinated Debentures in any such refunding of the Interim Subordinated Notes up to the aggregate principal amount of Subordinated Debentures which Hughes is so obligated to purchase." The transaction was to be completed by TWA's turning over to Toolco the cash received from the subscription offering in addition to accrued and unpaid interest on the interim notes to the date of refunding.

The subscription offering expired on June 8, 1961. On June 13, three business days thereafter, TWA delivered to Toolco some $19 million in cash received in the offering and nearly $81 million in unsubscribed debentures, totalling $100 million, the amount of the interim notes. TWA also paid Toolco interest on the $100 million to June 8 and interest on the $19 million through June 12. TWA paid no interest on the $81 million from June 8 through June 12 on the ground that it was substituting interest-bearing debentures for the interim notes.

In its sixth counterclaim, Toolco contends that under the terms of the financing agreement, TWA was obliged to pay interest on the interim notes to the date of refunding, June 13, and that TWA's failure to pay such interest resulted in Toolco's paying more than par value for the subordinated debentures, in violation of the terms of the agreement. We agree with Judge Metzner who found that "based on the overall arrangements between the parties, * * * it was their intention to substitute the debentures for the interim notes and that payment of double interest for the five days was not the intendment of the parties." The fact that the subordinated debentures were issued as of June 8 and bore interest from that date, in the same amount as the interim notes, indicates that the exchange for the notes was to be effective as of that date. The provision for having the closing three business days thereafter was merely to afford time for the preparation for that transaction.

The most plausible reading of the financing agreement would seem to be one which eliminates the double interest for the period between June 8 and June 13 which Toolco now seeks. Judge Metzner properly granted summary judgment to TWA on this counterclaim.

CONCLUSION

As to the first appeal, we find that the district court had jurisdiction of the action and that the Civil Aeronautics Board orders do not constitute a good defense to the antitrust claim of the plaintiff.

The orders of the district court in the second appeal are affirmed with the exception of the order dealing with the second counterclaim. The second counterclaim is dismissed for lack of jurisdiction.