ALOHA AIRLINES, INC., Plaintiff and
Counterdefendant,

v.

HAWAIIAN AIRLINES, INC., Defendant
and Counterclaimant.

Civ. No. 72–3594.

United States District Court,
D. Hawaii.

Feb. 16, 1973.

See also D.C., 349 F.Supp. 1964.

Vernon F. L. Char, Damon, Shigekane, Key & Char, Honolulu, Hawaii, Maxwell M. Blecher, Blecher & Collins, Los Angeles, Cal., for plaintiff and counterdefendant.

Daniel H. Case, Bortz, Case, Stack, Kay, Cronin & Clause, Honolulu, Hawaii, Joseph L. Alioto, Law Offices of Joseph L. Alioto, San Francisco, Cal., for defendant and counterclaimant.

## DECISION and ORDERS

SAMUEL P. KING, District Judge.

*Motion to add a national bank as a party defendant*

Plaintiff (hereinafter Aloha) has moved (1) to add "Chase Manhattan Bank" as a party defendant and (2) to file a second amended complaint.[1] Defendant (hereinafter Hawaiian) does not object to the filing of the second amended complaint but does object to the addition of "Chase Manhattan Bank" as a party defendant.

Counsel for The Chase Manhattan Bank, N.A. (hereinafter Chase)[2], have advised court and counsel by letter[3] that, while they acknowledge that Chase does not have any clear right to be heard on the motion as it affects Chase, if the motion is granted, Chase will move for dismissal on the grounds, among others, that venue is improper under 12 U.S.C. § 94.[4] For purposes of this motion, the parties have agreed that the court may take judicial notice that Chase is a national bank whose principal place of business is New York City.

Aloha suggests that the relationship between venue under 12 U.S.C. § 94 and venue under 15 U.S.C. §§ 15 and 22[5] has not yet been clarified, and cites Levin v. Great W. Sugar Co., 274 F.Supp. 974 (D.N.J.1967) (hereinafter *Levin*) for the proposition that a specific venue statute[6] may be interpreted as having impliedly amended 12 U.S.C. § 94 for

1. The second amended complaint adds a claim under Section 1 of the Sherman Act (alleging a combination or conspiracy between Hawaiian and Chase) and under Hawaii Revised Statutes Sections 480–2 and 9. The original complaint alleged offenses only under Section 2 of the Sherman Act.

2. Chase's official name is "The Chase Manhattan Bank, N.A."

3. Andrew J. Connick, Esq., of Milbank, Tweed, Hadley & McCloy, by letter dated February 1, 1973, set forth Chase's position in this regard. Under the circumstances, no purpose would be served to insist upon a more formal pleading.

4. "§ 94. Venue of suits. Actions and proceedings against any association under this chapter may be had in any district or Territorial court of the United States held within the district in which such association may be established, or in any State, county, or municipal court in the county or city in which said association is located having jurisdiction in similar cases." Enacted June 3, 1864. See also 28 U.S.C. § 1348, providing that national banking associations shall be deemed to be citizens of the States in which they are respectively "located".

5. "§ 15. Suits by persons injured; amount of recovery. Any person who shall be in-

jured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." Enacted October 15, 1914.

"§ 22. District in which to sue corporation. Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found." Enacted October 15, 1914.

6. 15 U.S.C. § 78aa, enacted June 6, 1934, relating to suits violative of the Securities Exchange Act of 1934, and specifically providing for venue "in the district wherein any act or transaction constituting the violation occurred" or "in the district wherein the defendant is found or is an inhabitant or transacts business," and that "process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found."

the special purposes of such statute.[7] Whatever the rule may be in the Third Circuit, the Ninth Circuit has taken the opposite view with respect to the same statute considered in *Levin*. United States National Bank v. Hill, 434 F.2d 1019 (9th Circuit 1970) (hereinafter *Hill*).[8] Thus, it is likely that Chase would prevail on this question of venue.

Aloha points out that venue may be waived, submits that Aloha is entitled to have the claim of improper venue asserted and briefed, and argues that policy considerations in the antitrust field should lead to a different result from *Hill*. These do not appear to me to be reasonable expectations under the circumstances.

Hawaiian, while not attempting to represent Chase, embraces the probability of improper venue as further support for the argument that the addition of Chase as a party defendant at this time would unduly and unnecessarily delay and confuse the proceedings to Hawaiian's prejudice. I agree.

Aside from the venue complication, there would be the expense and delay involved in discovery by Chase.[9] The allegations involving Chase all include Hawaiian, so that Aloha is not deprived of an issue upon which to go to the jury.[10] On the other hand, Aloha is attempting to associate Chase with all of the offenses and acts charged against Hawaiian, which invites extensive discovery by Chase covering not only ground already gone over in depositions taken by Aloha and Hawaiian to date but also matters taken up in CAB hearings to which both Aloha and Hawaiian were parties but Chase was not.[11] In pretrial conferences, Aloha made the point that preparation for trial has been expedited by evidence adduced before the CAB, and both parties felt that substantial portions of the CAB record could be stipulated into evidence here. There is also the possibility of the application of the doctrine of collateral estoppel or of *res judicata* to certain factual issues determined by the CAB as between Aloha and Hawaiian, a possibility that does not exist in relation to Chase.[12]

There is a reasonable expectation that this action, without Chase, will be disposed of this coming autumn. With Chase, there is a reasonable expectation

---

7. The *Levin* court cited an earlier case which had reached the opposite conclusion, but decided not to follow that case, although acknowledging that the general venue statute, 28 U.S.C. § 1391, did not repeal 12 U.S.C. § 94.

8. The court had before it claims of venue under both 15 U.S.C. § 78aa (of the Securities Exchange Act of 1934) and 15 U.S.C. § 77v (of the Securities Act of 1933). The provisions of these statutes are quite similar. The court reaffirmed an earlier holding that a national bank is "located" for the purposes of 28 U.S.C. § 1348 only in the state wherein it maintained its principal place of business, even though it has branch offices in other states, and cited a Supreme Court case for the proposition that a national bank can be sued *only* in the district in which it is "established or located". In *Hill* the suit was brought in the Central District of California where the national bank had a branch office, but the national bank's principal place of business was in the Southern District of California. The court granted a writ of mandamus requiring transfer of the entire case to the Southern District or dismissal of the national bank as a defendant. See also Helco, Inc. v. First National City Bank, 470 F.2d 883 (3rd Circuit 1972).

9. Not to mention the time required to dispose of predictable counter-pleadings by Chase.

10. Aloha may proceed with its Sherman Act Section 1 claims naming Chase as a co-wrongdoer if not as a co-defendant. Aloha may also file a separate action against Chase in New York.

11. Regarding depositions already taken, see Rule 32, F.R.Civ.P.

12. See Paramount Transport Sys. v. Chauffeurs, etc., Local, 436 F.2d 1064 (9th Circuit 1971). I assume that Chase and Hawaiian do not have the same interest and motive in cross-examining witnesses or deponents.

that the action would extend well into next year. Some of the argument has indicated that both Aloha and Hawaiian have major financial problems.[13] The sooner this suit is tried the better it will be for both parties.

■ The motion to add Chase as a party defendant is denied. The motion to file a second amended complaint is granted, except to the extent that the complaint adds Chase as a party defendant.

### Motion for reconsideration of alternate motions

Hawaiian has moved for reconsideration of the denial of its alternate motions of August 15, 1972, to dismiss the complaint or for summary judgment.[14]

The motion is based upon recent decisions filed subsequent to my earlier decision.

Hawaiian argues that Hughes Tool Co. v. Trans World Airlines, Inc., 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973) (hereinafter *Hughes Tool Co.*),[15] makes it clear that the CAB has exclusive jurisdiction over the matters alleged by Aloha in its second amended complaint;[16] and if not, that the principles enunciated in Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973) (hereinafter *Ricci*)[17] and Laveson v. Trans World Airlines, Inc., 471 F.2d 76 (3rd Circuit 1972) (hereinafter *Laveson*)[18] require a

13. One of Aloha's arguments for adding Chase is that Hawaiian had "admitted it may not have the resources to respond in damages should plaintiff be successful at trial." Aloha's financial difficulties are a matter of public record.

14. Aloha Airlines, Inc. v. Hawaiian Airlines, Inc., 349 F.Supp. 1064 (D.Hawaii 1972), decision filed October 11, 1972.

15. Hawaiian contends that *Hughes Tool Co.* is "on all fours" with the pending case in that each case involves allegations of bad faith merger negotiations to the complainant's damages. The suggested comparison does not bear closer analysis.

16. The CAB's authority over certain matters, and specifically over scheduling, is restricted by 49 U.S.C. § 1371(e)(4).

17. *Ricci* held that an antitrust suit for damages alleging violations of the rules of the Chicago Mercantile Exchange and of the Commodity Exchange Act should be stayed until the Commodity Exchange Commission could pass on the validity of the challenged conduct under the Commodity Exchange Act. Justice White said, in part:
"... We make no claim that the Commission has authority to decide either the question of immunity as such or that any rule of the Exchange takes precedence over antitrust policies. Rather, we simply recognize that Congress has established a specialized agency that would determine either that a

membership rule of the Exchange has been violated or that it has been followed. Either judgment would require determination of facts and the interpretation and application of the Act and exchange rules. And either determination will be of great help to the antitrust court in arriving at the essential accommodation between the antitrust and the regulator regime: The problem disappears entirely if it is found that there has been a violation of the rule; on the other hand, if it is found that the Exchange has merely followed and enforced its own rules, the antitrust court will be in a position to make a more intelligent and sensitive judgment as to whether the antitrust laws will punish what an apparently valid rule of the Exchange permits." (409 U.S. at page 307, 93 S.Ct. at page 583).

18. *Laveson* held that an antitrust suit against three airlines for damages alleging a conspiracy to fix the price to coach passengers for the rental of headsets used with inflight motion pictures should be stayed pending determination by the CAB whether the alleged agreement was approved and whether the CAB had the power to immunize retroactively pre-approval conduct, on the ground that the issues raised by the suit came within the primary jurisdiction of the CAB, as provided specifically by 49 U.S.C. § 1382. The court stated that the primary jurisdiction doctrine applied to an agreement within the jurisdiction of the CAB even if the agreement had not yet been filed

stay of these proceedings pending a decision by the CAB as to whether Hawaiian's alleged activities constituted unfair or deceptive practices or unfair methods of competition.[19]

On both points, I adhere to my earlier decision.

At that time, Trans World Airlines, Inc. v. Hughes, 332 F.2d 602 (2nd Circuit 1964) (hereinafter *TWA*) was cited for certain propositions. *Hughes Tool Co.* reversed *TWA*. Upon reexamination of my earlier decision, I conclude that the references to *TWA* were not crucial to the result reached.[20]

Hawaiian reads *Hughes Tool Co.* as holding that all acts that could be the subject of a CAB order are immunized

---

with the board, and even though the plaintiffs in the antitrust action were seeking a remedy (treble damages) that the CAB could not grant. The alleged illegal agreement had in fact been filed with the CAB which had considered and was holding in abeyance certain proposed actions relative thereto.

19. Aloha did file a complaint with the CAB pursuant to 49 U.S.C. § 1381 against Hawaiian based on Hawaiian's scheduling practices. CAB Docket 21604. Hawaiian countered with a similar complaint against Aloha. CAB Docket 21695. Both "enforcement proceedings" were "dismissed without prejudice" by order adopted December 30, 1971, which also approved a scheduling agreement (agreement CAB 22539 and Amendment 1 thereto), between Aloha and Hawaiian, looking to the future (to July 15, 1973). The order of December 30, 1971, further provides: "4. Pursuant to 49 U.S.C. 1382(b), the Board will retain continuing jurisdiction over this agreement and may modify its approval of, or disapprove the agreement at any time without hearing, or take whatever action may be deemed appropriate."

20. Firstly, Chief Judge Lumbard was quoted as saying in *TWA*:
"The proposition has so often been stated that it has become hornbook law that immunity from the operation of the antitrust laws is not lightly to be inferred from the enactment of a regulatory statute. See Georgia v. Pennsylvania R. Co., 324 U.S. 439, [65 S.Ct. 716, 89 L.Ed. 1051]." (332 F.2d at page 606).
Justice Douglas shifts the emphasis but not the result when he says in *Hughes Tool Co.*:
"We repeat . . . what we said in the *Pan American* case that the Federal Aviation Act does not completely displace the antitrust laws.
" 'While the Board is empowered to deal with numerous aspects of what

are normally thought of as antitrust problems, those expressly entrusted to it encompass only a fraction of the total.' 371 U.S. [296], at 305 [83 S.Ct. 476, at 482, 9 L.Ed.2d 325].
"One of the most conspicuous exceptions would be the combination or agreement between two air carriers involving trade restraints. See Timken Co. v. United States, 341 U.S. 593, 598 [71 S.Ct. 971, 974, 95 L.Ed. 1199].
"There may be other exceptions. . . . " (409 U.S. at page 387, 93 S.Ct. at page 661).
Secondly, *TWA* was cited, along with Pan American World Airways, Inc. v. U. S., 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed. 2d 325 (1963) (hereinafter *Pan Am*), as additional support for a quote from S.S.W., Inc. v. Air Transport Assoc. of America, 86 U.S.App.D.C. 273, 191 F.2d 658 (1952) (hereinafter *SSW*) at page 663, to the effect that Congress did not intend to deprive an air carrier of its right to seek treble damages for violations of the antitrust laws.
This quote may have suggested more than it should if it is taken to imply that an action for treble damages would lie for conduct subject to CAB jurisdiction which would have been subject to the operation of the antitrust laws but for CAB approval. It is clear from *Hughes*, and was clear before *Hughes*, that § 414 of the Federal Aviation Act (49 U.S.C. § 1384) immunizes from antitrust liability any conduct approved, authorized, or required by any CAB order under § 408 (49 U.S.C. § 1378), § 409 (49 U.S.C. § 1379), or § 412 (49 U.S.C. § 1382) of the Act.
Thirdly, *TWA* was cited in support of the proposition that the CAB does not have exclusive jurisdiction because the seven acts alleged by Aloha are not "basic to the regulatory scheme" of the Federal Aviation Act. The quoted phrase originated in *Pan Am*. Nothing in *Hughes Tool Co.* suggests that this posits an improper test of CAB jurisdiction, al-

from the operation of the antitrust laws.[21] Aloha reads *Hughes Tool Co.* as holding that only acts which have been approved, authorized or required by a valid CAB order are so immunized.[22]

■ I agree with Aloha's interpretation of the case.

In discussing the CAB's involvement in the challenged transactions, Justice Douglas said:

"One difficulty with the conclusion of the Court of Appeals [in *TWA*] that these transactions, unlike those involved in the *Pan American* case, were transactions on which the Board might take action but did not do so is that it misconstrues the record." *Hughes Tool Co.*, 409 U.S. at page 379, 93 S.Ct. at page 657.

"It is too clear for argument that in entering the 1950 order the Board fully realized that Toolco had determined and would determine when and how much new equipment would be purchased, from whom it would be acquired and how it would be financed. It was precisely this type of association that it contemplated when it ap-

proved the additional control obtained by Toolco in 1947. And it was precisely this same conclusion that the Board was implementing each time during the 1950's that it approved a sale or lease of an airplane from Toolco to TWA which, without its approval, would have violated the Board's on-going limitation on the size of inter-company transactions." *Hughes Tool Co.*, 409 U.S. at page 386, 93 S.Ct. at page 660.

There is no claim here that any of Hawaiian's acts of which Aloha complains were done pursuant to a valid CAB order.[23]

■ In *my earlier decision*, I held that this court cannot and should not apply the doctrine of primary jurisdiction to stay these proceedings pending CAB action. I do not read *Hughes, Ricci*, or *Laveson* as requiring a different result.

■ I understand *Ricci* and *Laveson* as holding that an antitrust action for treble damages based on conduct which could be approved, authorized, or required by the valid order of an administrative agency should be stayed pending a decision by that agency as to whether the conduct in question is or is not ap-

---

though the Supreme Court did disagree with the Circuit Court's application thereof.

Fourthly, *TWA* was cited for the proposition by analogy that acts preceding a CAB-approved merger may be the basis of an antitrust suit for damages. The analysis in *TWA* regarding antitrust liability for post-merger acts was rejected in *Hughes Tool Co.*, and the Supreme Court's reasoning suggests that pre-merger acts may be immunized from antitrust liability by a CAB order. In any event, here there is no CAB-approved merger, no CAB order approving, authorizing, or requiring any of Hawaiian's alleged acts, nor any proceeding in relation thereto pending before the CAB.

21. Hawaiian renews its argument that because Aloha could have proceeded against Hawaiian before the CAB under 49 U.S.C.

§ 1382, such a proceeding is Aloha's only remedy. But see *Ricci* and *Laveson* and the discussion below.

22. *Hughes Tool Co.* and *Laveson* give a CAB order both retrospective and prospective effect. A CAB order approving, authorizing, or requiring certain conduct necessarily includes some prior acts associated with such conduct, and not only future acts consistent with the order.

23. Aloha contends that "the CAB has already held that Hawaiian's over-scheduling was the sole cause of Aloha's inability to attain a load factor of 55.1% in the period indicated and that as a result of that conduct Aloha lost substantial revenues." Motion for Partial Summary Judgment under Rule 56 or, in the Alternative, for a Pre-Trial Order Under Rule 16, filed January 24, 1973.

proved, authorized, or required.[24] If so, no damage action lies.[25] If not, the damage action does lie.[26]

Here the acts by Hawaiian of which Aloha complains could not now be approved, authorized, or required by the CAB.[27] There is therefore nothing to refer to the CAB.[28]

The motion for reconsideration is denied.

24. See footnotes 17, 18, 20, and 22, *supra*.

25. The validity and scope of the order are subject to court review. See *Ricci*.

26. By order adopted February 7, 1973, the CAB entered its Supplemental Opinion on Reconsideration and Order Denying Motion, saying in part:

"Finally, the Board is cognizant of the antitrust suit which has been filed by Aloha against Hawaiian in . . . Hawaii . . . We believe it appropriate to include a provision in the rate whereby Aloha's subsidy award will be reduced by the amount of any recovery in the litigation, or in a settlement thereof, to the extent that such recovery relates to damages sustained during the 5½-month subsidy period . . . "

The Board noted specifically that it was not expressing any view concerning the merits of Aloha's complaint.

The subsidy period is September 16, 1968 through February 28, 1969.

The period during which the offenses set forth in the complaint are alleged to have taken place is "Beginning as early as 1968 and continuing to the date of the filing of this Complaint [July 3, 1972]" except for the alleged "predatory, excessive scheduling" which continued until the CAB-approved scheduling agreement of December 8, 1970.

27. The proposed second amended complaint details these acts and their effects as follows:

"IV: OFFENSES CHARGED

11. Beginning at least as early as 1968 and continuing up to the date of the filing of this Complaint, defendant HAWAIIAN, acting in concert with defendant CHASE, has been engaged in a plan, program, and attempt to restrain and to monopolize trade and commerce in inter-island air transportation in the State of Hawaii in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. 1, 2) and Sections 480–2 and 9 of the Hawaii Revised Statutes.

12. The aforesaid plan, program and attempt to monopolize consisted of the following acts, all undertaken with the predatory intent and purpose of eliminating as a viable competitor:

(a) Defendant HAWAIIAN, acting in active concert with defendant CHASE, scheduled excessive flights over and beyond the actual and anticipated needs and requirements of the public.

(i) In August, 1966, ALOHA scheduled 399 weekly flights on the four major route segments while HAWAIIAN had only 339; by August, 1968, HAWAIIAN increased the number of its scheduled flights to 486 while ALOHA actually reduced the number of its flights to 368; using 1966 as a base of 100, ALOHA's frequency of scheduled weekly flights on the four major route segments decreased in 1968 to 92, while HAWAIIAN's increased to 143; by 1969, HAWAIIAN's frequency had increased to 189% of the 1966 level, while ALOHA's had increased to 123% of the 1966 level.

(ii) During the period 1966–1968, ALOHA's passenger load factor declined from 59.5% to 44.7%.

(iii) The foresaid predatory, excessive scheduling continued until late 1970, when, at the urging and under the auspices of the Civil Aeronautics Board, HAWAIIAN and ALOHA reached agreement on flight schedules pursuant to which each company secured a share of the passenger market closely related to each company's historic position.

(b) Defendant HAWAIIAN, with the active participation of defendant CHASE, and with its advice, permission and consent, purchased, ordered, leased or agreed to lease an excessive number of aircraft;

(c) Defendant HAWAIIAN misrepresented its schedule to the public in order to induce members of the public to obtain discount flights;

(d) Defendant HAWAIIAN attempted to undercut and provide services below cost to interstate air carriers in the area of servicing aircraft between stops;

(e) Defendant HAWAIIAN has repeatedly publicized the fact that the two airlines should merge, with HAWAIIAN being in control, thereby undermining the confidence of the public, the travel industry, stockholders, creditors and employees of plaintiff;

28. See note 28 on page 436.

(f) Defendant HAWAIIAN, acting in active concert with defendant CHASE, has twice renounced merger agreements into which the two companies had entered and conducted such discussions and entered into such merger agreements in bad faith;

(g) Defendant HAWAIIAN has opposed the request of plaintiff before the Civil Aeronautics Board to obtain a subsidy to assist it in its financial plight.

13. Defendants did all of the things described in paragraph 12, with full knowledge of their impact on plaintiff and with the intent of injuring and destroying plaintiff; moreover, defendants did all of the things described in paragraph 12, with full knowledge of the serious losses it would cause to itself.

V: EFFECT UPON AND INJURY TO PLAINTIFF

14. As determined by the Civil Aeronautics Board, ALOHA sustained a severe drop in its passenger load factor closely as a result of HAWAIIAN's predatory scheduling practices and though ALOHA made reasonable attempts to adjust its capacity downward, it was unable, in the face of a continued expansion of schedules by HAWAIIAN, to stem the decline in its load factor. Thus, ALOHA's excessively low load factors were beyond its control and ALOHA was a victim of HAWAIIAN's excessive predatory scheduling. Between 1967 and 1970, ALOHA's share of revenue passenger miles in the inter-island air market declined from 42.3% to 36.5%. There is an almost direct correlation between the number of scheduled flights and share of inter-island revenue passenger miles.

15. During the period in which HAWAIIAN, in bad faith, conducted merger negotiations with ALOHA, it continued its predatory, excessive scheduling and took other affirmative steps to injure and weaken ALOHA.

16. Since late 1970, when under the aegis of the Civil Aeronautics Board, HAWAIIAN and ALOHA reached an agreement on flight schedules, which agreement has since been continued in force, ALOHA has begun to operate profitably, thus establishing that HAWAIIAN's overscheduling caused plaintiff loss of profits and damages.

17. Thus, as a direct and proximate result of defendants' violations of the antitrust laws herein alleged, plaintiff has been injured in an amount not yet ascertained but believed to be not less than Seven Million Seven Hundred Thousand Dollars ($7,700,-000), consisting of its actual losses since 1968."

28. *Laveson* makes the point that the earlier decision herein rests not solely on the ground that the CAB lacks the power to award damages, but also on the ground that the allegedly illegal conduct was not an ongoing problem. Stated another way, it would be irrational to require Aloha to ask the CAB to enjoin conduct which had already ceased. There is no CAB proceeding that can now be instituted which could support a CAB order having the effect of immunizing from antitrust liability the conduct set forth in the proposed second amended complaint.