# PAN AMERICAN WORLD AIRWAYS, INC., *v.* UNITED STATES.

No. 23.   Argued November 8, 1962.—Decided January 14, 1963.*

---

*Together with No. 47, *United States* v. *Pan American World Airways, Inc., et al.,* also on appeal from the same Court.

*David W. Peck* argued the cause and filed briefs for Pan American World Airways, Inc., appellant in No. 23 and appellee in No. 47.

*Solicitor General Cox* argued the cause for the United States. With him on the briefs were *Assistant Attor-*

*ney General Loevinger, Bruce J. Terris* and *Robert B. Hummel.*

*Lawrence J. McKay* argued the cause for W. R. Grace & Co., appellee in No. 47. With him on the briefs were *William E. Hegarty* and *Raymond L. Falls, Jr.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a civil suit brought by the United States charging violations by Pan American, W. R. Grace & Co., and Panagra of §§ 1, 2, and 3 of the Sherman Act, 15 U. S. C. §§ 1, 2, and 3. This suit, which the Civil Aeronautics Board requested the Attorney General to institute, charged two major restraints of trade. First, it is charged that Pan American and Grace, each of whom owns 50% of the stock of Panagra, formed the latter under an agreement that Panagra would have the exclusive right to traffic along the west coast of South America free from Pan American competition and that Pan American was to be free from competition of Panagra in other areas in South America and between the Canal Zone and the United States. Second, it is charged that Pan American and Grace conspired to monopolize and did monopolize air commerce between the eastern coastal areas of the United States and western coastal areas of South America and Buenos Aires. Pan American was also charged with using its 50% control over Panagra to prevent it from securing authority from the C. A. B. to extend its route from the Canal Zone to the United States.[1]

---

[1] Another charge relates to alleged restraints on Panagra by its two stockholders which the District Court summarized as follows:

"To a large extent the evidence of restraints on Panagra in the categories of joint offices, communications, equipment, publicity and sales are matters of agreement that must be initially approved by the C. A. B. and to a large degree have been approved and others are awaiting approval or extension of approval previously granted." 193 F. Supp. 18, 22.

In 1928, when Pan American and Grace entered into an agreement to form Panagra,[2] air transportation was in its infancy; and this was the first entry of an American air carrier on South America's west coast. Pan American in 1930 acquired the assets of an airline competing with it for air traffic from this country to the north and east coasts of South America and received a Post Office air mail subsidy contract.[3]

The District Court found that there was no violation by Pan American and Grace of § 1 of the Sherman Act through the division of South American territory between Pan American and Panagra.[4] It held, however, that Pan

[2] Panagra was organized January 25, 1929, and received on March 2, 1929, an air mail contract from the Postmaster General (see 45 Stat. 248, 1449) even though it was not the lowest bidder. See 36 Op. Atty. Gen. 33.

[3] The District Court said:

"The award of a Post Office contract for each sector of South America, in effect, assured the American contractor of a monopoly in that sector insofar as American flag operations were concerned, and the invaluable assistance of the State Department and Post Office Department in the carrier's relations with the countries along its route." 193 F. Supp. 18, 31.

[4] The District Court said:

"The State Department actively assisted defendants in defeating the foreign company designs for monopoly concessions and in securing American operating rights along their routes. The contracts awarded by the Post Office Department defined the international route of the contractor, and so to a large extent defined the area of development and expansion of any such contractor. The Post Office policy during the years 1928 to 1938 was to award but one contract for each route, in effect to subsidize one American carrier in a particular sector. The ideal route pattern as envisaged by the C. A. B. today is to have two carriers, Pan American and a merged 'Panagra-Braniff,' and the only difference from that existing prior to Braniff's entry would be the extension of 'Panagra-Braniff' to the United States. Competition among American carriers under the policy of the Post Office Department under the foreign mail contracts, was economically impossible, and most likely detrimental to the sound

American violated § 2 of the Sherman Act by suppressing Panagra's efforts to extend its route from the Canal Zone to this country—in particular, by blocking Panagra's application to the Civil Aeronautics Board for a certificate for operation north of the Canal Zone.[5]   It indicated that Pan American should divest itself of Panagra stock. But it directed dismissal of the complaint against Grace and against Panagra, holding that none of their respective practices violated the Sherman Act.   193 F. Supp. 18. Both Pan American and the United States come here on direct appeals (15 U. S. C. § 29); and we postponed the question of jurisdiction to the merits.   368 U. S. 964, 966.

When the transactions, now challenged as restraints of trade and monopoly, were first consummated, air carriers were not subject to pervasive regulation.   In 1938 the Civil Aeronautics Act (52 Stat. 973) was passed which

development of American flag service, which would have complicated or embarrassed the effective 'rendition of diplomatic assistance from the State Department, and actually cause a waste of public monies. Competition between Panagra and Pan American certainly was not encouraged by this government.   On the contrary, there appears to emerge from the evidence presented a definite policy of the government approving a sort of 'zoning' for the operations of the American international carriers in the nature of east and west coast spheres as was ultimately arranged between Pan American and Panagra.   Agreement not to parallel each other's service in South America seems perfectly consistent with the air transportation policy of this country in those formative years."   193 F. Supp. 18, 34.

[5] See *Panagra Terminal Investigation,* 4 C. A. B. 670, remanded, *W. R. Grace & Co.* v. *C. A. B.,* 154 F. 2d 271.   We granted certiorari, 328 U. S. 832, and later dismissed the case as moot, 332 U. S. 827, because Pan American and Panagra had settled their dispute through an agreement approved by the C. A. B. (see note 15, *infra*), after the C. A. B. had said that joint control of Panagra by Pan American and Grace was "unhealthy" (4 C. A. B. 670, 678) and that "the joint owners cooperatively should enable Panagra to apply for access to the east coast of the United States." *Additional Service to Latin America,* 6 C. A. B. 857, 914.

was superseded in 1958 by the Federal Aviation Act, 72 Stat. 731, 49 U. S. C. § 1301 *et seq.*, the latter making no changes relevant to our present problem. Since 1938, the industry has been regulated under a regime designed to change the prior competitive system. As stated in S. Rep. No. 1661, 75th Cong., 3d Sess., p. 2, "Competition among air carriers is being carried to an extreme, which tends to jeopardize the financial status of the air carriers and to jeopardize and render unsafe a transportation service appropriate to the needs of commerce and required in the public interest, in the interests of the Postal Service, and of the national defense."

Some provisions of the 1938 Act deal only with the future, not the past. Such, for example, are the provisions dealing with abandonment of routes (§ 401 (k)), with loans or financial aid from the United States (§ 410), and with criminal penalties. § 902. The Act, however, did not freeze the *status quo* nor attempt to legalize all existing practices. Thus § 401 requires every "air carrier" to acquire a certificate from the Board, a procedure being provided whereby some could obtain "grandfather" rights. By § 401 (h) the Board has authority to alter, amend, modify, or suspend certificates whenever it finds such action to be in the public interest.

Section 409, in regulating interlocking relations between air carriers and other common carriers or between air carriers and those "engaged in any phase of aeronautics," looks not only to the future but to the past as well. For the prohibition is that no air carrier may "have and retain" officers or directors of the described classes. Section 408, which is directed at consolidations, mergers, and acquisition of control over an "air carrier," makes it unlawful, unless approved by the Board, for any "common carrier" to "purchase, lease, or contract to operate the properties" of an "air carrier" or to "acquire control of any air carrier in any manner whatsoever" or to "continue

to maintain any relationship established in violation of any of the foregoing" provisions of § 408 (a). By § 408 (b) a common carrier is taken to be an "air carrier" for the purposes of § 408; and transactions that link "common carriers" to "air carriers" shall not be approved unless the Board finds that "the transaction proposed will promote the public interest by enabling such carrier other than an air carrier to use aircraft to public advantage in its operation and will not restrain competition."

We do not suggest that Grace, a common carrier, need get the Board's approval to continue the relationship it had with Panagra when the 1938 Act became effective.[6] It is clear, however, that the Board under § 411 of the 1958 Act has jurisdiction over "unfair practices" and "unfair methods of competition" even though they originated prior to 1938.

That section provides:

> "The Board may, upon its own initiative or upon complaint by any air carrier, foreign air carrier, or ticket agent, if it considers that such action by it would be in the interest of the public, investigate and determine whether any air carrier, foreign air carrier, or ticket agent *has been or is engaged in unfair* or deceptive *practices* or *unfair methods of competition in air transportation* or the sale thereof. If the Board shall find, after notice and hearing, that such air carrier, foreign air carrier, or ticket agent is engaged in such *unfair* or deceptive *practices* or *unfair methods of competition,* it shall order *such air carrier,* foreign air carrier, or ticket agent to cease and desist from such practices or methods of competition." (Italics added.) 49 U. S. C. § 1381.

---

[6] The Board has held that § 408 (a) is not retroactive. *Railroad Control of Northeast Airlines,* 4 C. A. B. 379, 386. And see *National Air Freight Forward. Corp.* v. *C. A. B.,* 90 U. S. App. D. C. 330, 335, 197 F. 2d 384, 389.

The words "has been or is engaged in unfair . . . practices or unfair methods of competition" plainly include practices started before the 1938 Act and continued thereafter [7] as well as practices instituted after the effective date of the Act.

The parentage of § 411 is established. As the Court stated in *American Airlines* v. *North American Airlines,* 351 U. S. 79, 82, this section was patterned after § 5 of the Federal Trade Commission Act,[8] and "[w]e may profitably look to judicial interpretation of § 5 as an aid in the resolution of . . . questions raised . . . under § 411." As respects the "public interest" under § 411, the Court said:

"... the air carriers here conduct their business under a regulated system of limited competition. The business so conducted is of especial and essential concern to the public, as is true of all common carriers and public utilities. Finally, Congress has committed the regulation of this industry to an administrative agency of special competence that deals only with the problems of the industry." *Id.,* 84.

---

[7] The Sherman Act was applied to pre-1890 combinations: *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290, 342; *Waters-Pierce Oil Co.* v. *Texas* (No. 1), 212 U. S. 86, 107–108 (Texas version of the Sherman Act) ; see also *Cox* v. *Hart,* 260 U. S. 427, 435; *American P. & L. Co.* v. *Securities & Exchange Comm'n,* 141 F. 2d 606, 625 (C. A. 1st Cir.), affirmed, 329 U. S. 90.

Moreover, as we recently stated in *United States* v. *duPont & Co.,* 353 U. S. 586, 607, "... the test of a violation of § 7 is whether, *at the time of suit,* there is a reasonable probability that the acquisition is likely to result in the condemned restraints." (Italics added.)

[8] The original Act took out from under the jurisdiction of the Federal Trade Commission, "air carriers and foreign air carriers subject to the Civil Aeronautics Act of 1938." 52 Stat. 973, 1028, § 1107 (f).

The Board in regulating air carriers is to deal with at least some antitrust problems. Apart from its power under § 411, it is given authority by §§ 408 and 409, as already noted, over consolidations, mergers, purchases, leases, operating contracts, acquisition of control of an air carrier, and interlocking relations. Pooling and other like arrangements are under the Board's jurisdiction by reason of § 412. Any person affected by an order under §§ 408, 409 and 412 is "relieved from the operations of the 'antitrust laws,' " including the Sherman Act. § 414. The Clayton Act, insofar as it is applicable to air carriers, is enforceable by the Board. 52 Stat. 973, 1028, § 1107 (g); 15 U. S. C. § 21.

There are various indications in the legislative history that the Civil Aeronautics Board was to have broad jurisdiction over air carriers, insofar as most facets of federal control are concerned.

The House Report stated:

"It is the purpose of this legislation to coordinate in a single independent agency all of the existing functions of the Federal Government with respect to civil aeronautics, and, in addition, to authorize the new agency to perform certain new regulatory functions which are designed to stabilize the air-transportation industry in the United States." H. R. Rep. No. 2254, 75th Cong., 3d Sess., p. 1.

No mention is made of the Department of Justice and its role in the enforcement of the antitrust laws, yet we hesitate here, as in comparable situations,[9] to hold that

---

[9] Cf. *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439, holding that the Interstate Commerce Act is no bar to an antitrust suit against a carrier; *United States* v. *R. C. A.*, 358 U. S. 334, holding that the Federal Communications Act is no bar to an antitrust suit against TV and radio licensees; *United States* v. *Borden Co.*, 308 U. S. 188, 195–199, holding that neither the Agricultural Adjustment Act nor

the new regulatory scheme adopted in 1938 was designed completely to displace the antitrust laws—absent an unequivocally declared congressional purpose so to do. While the Board is empowered to deal with numerous aspects of what are normally thought of as antitrust problems, those expressly entrusted to it encompass only a fraction of the total. Apart from orders which give immunity from the antitrust laws by reason of § 414, the whole criminal law enforcement problem remains unaffected by the Act. Cf. *United States* v. *Pacific & Arctic Co.,* 228 U. S. 87, 105. Moreover, on the civil side violations of antitrust laws other than those enumerated in the Act might be imagined. We, therefore, refuse to hold that there are no antitrust violations left to the Department of Justice to enforce.

That does not, however, end our inquiry. Limitation of routes and divisions of territories and the relation of common carriers to air carriers are basic in this regulatory scheme. The acts charged in this civil suit as antitrust violations are precise ingredients of the Board's authority in granting, qualifying, or denying certificates to air carriers, in modifying, suspending, or revoking them, and in allowing or disallowing affiliations between common carriers and air carriers.[10] The case is therefore quite unlike *Georgia* v. *Pennsylvania R. Co., supra,* where a conspiracy among carriers for the fixing of through and joint rates was held to constitute a cause of action under

the Capper-Volstead Act displaced the Sherman Act; and *California* v. *Federal Power Comm'n,* 369 U. S. 482, holding that the Clayton Act was not displaced by the Natural Gas Act. And see *Milk Producers Assn.* v. *United States,* 362 U. S. 458.

[10] In *Pan American-Matson-Inter-Island Contract,* 3 C. A. B. 540, the Board rejected a proposal for the creation of a joint company similar to Panagra for service to Hawaii. Such joint ventures, as we note in the opinion, may be combinations in violation of the antitrust laws. See *Timken Roller Bearing Co.* v. *United States,* 341 U. S. 593, 598.

the antitrust laws, in view of the fact that the Interstate Commerce Commission had no power to grant relief against such combinations.[11]   And see *United States* v. *R. C. A.,* 358 U. S. 334, 346.   And the present Act does not have anything comparable to the history of the Capper-Volstead Act, which we reviewed in *Milk Producers Assn.* v. *United States,* 362 U. S. 458, and which showed that farmer-producers were not made immune from the class of predatory practices charged in that civil suit as antitrust violations.   *Id.,* pp. 464–467.

The words "unfair . . . practices" and "unfair methods of competition" as used in § 411 contain a "broader" concept than "the common-law idea of unfair competition." *American Airlines* v. *North American Airlines, supra,* 85. They derive, as already noted, from the Federal Trade Commission Act; and their meaning in the setting of that Act has been much discussed.   They do not embrace a remedy for private wrongs but only a means of vindicating the public interest.   *Federal Trade Comm'n* v. *Klesner,* 280 U. S. 19, 25–30.   The scope of "unfair practices" and "unfair methods of competition" was left for case-by-case definition.   The Senate Report stated:

> "It is believed that the term 'unfair competition' has a legal significance which can be enforced by the commission and the courts, and that it is no more difficult to determine what is unfair competition than it is to determine what is a reasonable rate or what is an unjust discrimination.   The committee was of

---

[11] It should be noted that the result in *Georgia* v. *Pennsylvania R. Co., supra,* might today be different as a result of the Act of June 17, 1948, 62 Stat. 472, which gives the Interstate Commerce Commission authority to approve combinations of the character involved in that case and give them immunity from the antitrust laws.   See S. Rep. No. 1511, 79th Cong., 2d Sess.; H. R. Rep. No. 1212, 79th Cong., 1st Sess.; H. R. Rep. No. 1100, 80th Cong., 1st Sess.   This Act was passed over a presidential veto.   See 94 Cong. Rec. 8435, 8633.

the opinion that it would be better to put in a general provision condemning unfair competition than to attempt to define the numerous unfair practices, such as local price cutting, interlocking directorates, and holding companies intended to restrain substantial competition." S. Rep. No. 597, 63d Cong., 2d Sess., p. 13.

The legislative history was reviewed in *Federal Trade Comm'n* v. *Raladam Co.*, 283 U. S. 643, 649–650, the Court concluding that "unfair competition was that practice which destroys competition and establishes monopoly." *Id.*, 650. The provision was designed to supplement the Sherman Act by stopping "in their incipiency those methods of competition which fall within the meaning of the word 'unfair.' . . . All three statutes [the Sherman and Clayton Acts and § 5] seek to protect the public from abuses arising in the course of competitive interstate and foreign trade." [12] *Id.*, 647. See *Federal Trade Comm'n* v. *Beech-Nut Co.*, 257 U. S. 441, 453–454; *Federal Trade Comm'n* v. *Keppel & Bro.*, 291 U. S. 304, 310–312; 2 Toulmin's Anti-Trust Laws (1949) § 43.6. Joint ventures may be combinations in violation of the antitrust laws. *Timken Roller Bearing Co.* v. *United States*, 341 U. S. 593, 598. Whatever the unfair practice or unfair method employed, § 411 of this Act, like § 5 of the Federal Trade Commission Act (*Federal Trade Comm'n* v. *Motion Picture Adv. Co.*, 344 U. S. 392, 394–395), was designed to bolster and strengthen antitrust enforcement.

We have said enough to indicate that the words "unfair practices" and "unfair methods of competition" are not limited to precise practices that can readily be catalogued. They take their meaning from the facts of each case and

---

[12] And see the debates in 51 Cong. Rec. 11874–11876; 12022–12025; 12026–12032

the impact of particular practices on competition and monopoly.

These words, transferred to the Civil Aeronautics Act, gather meaning from the context of that particular regulatory measure and the type of competitive regime which it visualizes. Cf. *American Power Co.* v. *Securities & Exchange Comm'n,* 329 U. S. 90, 104–105. That regime has its special standard of the "public interest" as defined by Congress. The standards to be applied by the Board in enforcing the Act are broadly stated in § 2:

> "In the exercise and performance of its powers and duties under this chapter, the Board shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity—
>
> "(a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;
>
> "(b) The regulation of air transportation in such manner as to recognize and preserve the inherent advantages of, assure the highest degree of safety in, and foster sound economic conditions in, such transportation, and to improve the relations between, and coordinate transportation by, air carriers;
>
> "(c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;
>
> "(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

"(e) The regulation of air commerce in such manner as to best promote its development and safety; and

"(f) The encouragement and development of civil aeronautics." 52 Stat. 980. And see 49 U. S. C. § 1302.

The "present and future needs" of our foreign and domestic commerce, regulations that foster "sound economic conditions," the promotion of service free of "unfair or destructive competitive practices," regulations that produce the proper degree of "competition"—each of these is pertinent to the problems arising under § 411.

It would be strange, indeed, if a division of territories or an allocation of routes which met the requirements of the "public interest" as defined in § 2 were held to be antitrust violations. It would also be odd to conclude that an affiliation between a common carrier and an air carrier that passed muster under § 408 should run afoul of the antitrust laws. Whether or not transactions of that character meet the standards of competition and monopoly provided by the Act is peculiarly a question for the Board, subject of course to judicial review as provided in 49 U. S. C. § 1486. Cf. *Federal Maritime Bd.* v. *Isbrandtsen Co.,* 356 U. S. 481; *Schaffer Transportation Co.* v. *United States,* 355 U. S. 83.

In case of a prospective application of the Act, the Board's order, as noted, would give the carrier immunity from antitrust violations "insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order." § 414. Alternatively, the Board under § 411 can investigate and bring to a halt all "unfair . . . practices" and all "unfair methods of competition," including those which started prior to the Act.[13]

---

[13] We note, in addition, that the Board itself has assumed jurisdiction under changed circumstances in those areas covered by § 408, in which it has found only prospective authority. *Railroad Control of Northeast Airlines, supra,* note 6.

If the courts were to intrude independently with their construction of the antitrust laws, two regimes might collide. Furthermore, many of the problems presented by this case, which involves air routes to and in foreign countries, may involve military and foreign policy considerations that the Act, as construed by a majority of the Court in *Chicago & Southern Air Lines* v. *Waterman S. S. Corp.*, 333 U. S. 103, subjects to presidential rather than judicial review. It seems to us, therefore, that the Act leaves to the Board under § 411 all questions of injunctive relief against the division of territories or the allocation of routes or against combinations between common carriers and air carriers.[14] See *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426; *Keogh* v. *Chicago & N. W. R. Co.*, 260 U. S. 156.

The fact that transactions occurring before 1938 are involved in this case does not change our conclusion. The past is prologue and the impact of pre-1938 transactions on present problems of air carriers is eloquently demonstrated in a recent order of the Board concerning the United States flag carrier route pattern between this country and South America which is set forth in part in the Appendix to this opinion. The status of Panagra—

---

[14] An "air carrier" is defined in § 1 (2) as "any citizen of the United States who undertakes, whether directly or indirectly or by a lease or any other arrangement, to engage in air transportation: *Provided,* That the Authority may by order relieve air carriers who are not directly engaged in the operation of aircraft in air transportation from the provisions of this Act to the extent and for such periods as may be in the public interest." Whether there might be "a reasonable basis in law" (*Labor Board* v. *Hearst Publications, Inc.*, 322 U. S. 111, 131) for a Board conclusion that Grace is an "air carrier" by reason of its negative control over Panagra is a matter on which we intimate no view. We mention the matter so as not to foreclose the question by any implication drawn from our separate treatment of common carriers and air carriers.

jointly owned by Pan American and Grace—is central to that problem,[15] as that order makes clear. What was done in the pre-1938 days may be so disruptive of the regime visualized by the Act or so out of harmony with the statutory standards for competition set by the Act [16] that it should be undone in proceedings under § 411. The transactions in question are reached by the terms of § 411. But more important, the particular relation of this problem to the general process of encouraging development of new fields of air transportation makes it all the more appropriate that the Board should decide whether these particular transactions should be undone in whole or in part, or whether they should be allowed to continue.

It is suggested that the power of the Board to issue a "cease and desist" order is not broad enough to include the power to compel divestiture and that in any event its power to do so under § 411 runs solely to air carriers, not to common carriers or other stockholders. We do not read the Act so restrictively. The Board has no power to award damages or to bring criminal prosecutions. Nor does it,

---

[15] Phases of issues related to those in the present litigation have indeed been before the Board. Note 5, *supra.* It held in an investigation that it had no authority to accomplish the compulsory extension of Panagra's route to the United States (*Panagra Terminal Investigation,* 4 C. A. B. 670), a ruling reviewed by the Court of Appeals which remanded the matter to the Board for further consideration. *W. R. Grace & Co.* v. *Civil Aeronautics Board,* 154 F. 2d 271. Before that controversy had been resolved, Pan American and Panagra entered a "through flight agreement" which in essence provided that Pan American would charter any aircraft operated by Panagra from the south to the Canal Zone and operate it on its schedules to the United States. This agreement, with exceptions not material here, was approved by the Board. *Pan American-Panagra Agreement,* 8 C. A. B. 50.

[16] For a discussion of the Board's policy in issuing certificates to competing air carriers, see Hale and Hale, Competition or Control IV: Air Carriers, 109 U. of Pa. L. Rev. 311, 314–318.

as already noted, have jurisdiction over every antitrust violation by air carriers. But where the problem lies within the purview of the Board, as do questions of division of territories, the allocation of routes, and the affiliation of common carriers with air carriers, Congress must have intended to give it authority that was ample to deal with the evil at hand.

We need not now determine the ultimate scope of the Board's power to order divestiture under § 411. It seems clear that such power exists [17] at least with respect to the particular problems involved in this case. Of principal importance here, we think, is the fact that the Board could have retained such power over these transactions, if they had occurred after 1938, by so conditioning its grant of approval. The terms of § 411 do not distinguish between conduct before or after that date. If the Act is to be administered as a coherent whole, we think § 411 must include an equivalent power over pre-enactment events of the kind involved in this case [18]—although, of course,

[17] We have heretofore analogized the power of administrative agencies to fashion appropriate relief to the power of courts to fashion Sherman Act decrees. *Federal Trade Comm'n* v. *Mandel Bros.*, 359 U. S. 385, 392–393. Authority to mold administrative decrees is indeed like the authority of courts to frame injunctive decrees (*Labor Board* v. *Express Pub. Co.*, 312 U. S. 426, 433, 436; *Labor Board* v. *Cheney Lumber Co.*, 327 U. S. 385) subject of course to judicial review. Dissolution of unlawful combinations, when based on appropriate findings (*Schine Theatres* v. *United States*, 334 U. S. 110, 129–130), is an historic remedy in the antitrust field, even though not expressly authorized. *United States* v. *Crescent Amusement Co.*, 323 U. S. 173, 189. Likewise, the power to order divestiture need not be explicitly included in the powers of an administrative agency to be part of its arsenal of authority, as we held only the other day in *Gilbertville Trucking Co.* v. *United States*, 371 U. S. 115. Cf. *Federal Trade Comm'n* v. *Eastman Kodak Co.*, 274 U. S. 619.

[18] There is no express authority for divestiture in either the Sherman or Clayton Act. See 15 U. S. C. §§ 4, 25. The reasoning that supports such a remedy under those Acts is as applicable to the

the Board might find that the historic background of these pre-1938 transactions introduces different considerations in formulating a suitable resolution of the problem involved.

We think[e] the narrow questions presented by this complaint have been entrusted to the Board and that the complaint should have been dismissed.[19]   Accordingly we reverse the judgment and remand the case for proceedings in conformity with this opinion.

*So ordered.*

MR. JUSTICE CLARK and MR. JUSTICE HARLAN took no part in the consideration or decision of these cases.

[For dissenting opinion of MR. JUSTICE BRENNAN, see *post,* p. 319.]

Board as it is to the courts, and it is as valid today as it was when originally stated by the first Justice Harlan:

"All will agree that if the . . . Act be constitutional, and if the combination in question be in violation of its provisions, the courts may enforce the provisions of the statute by such orders and decrees as are necessary or appropriate to that end and as may be consistent with the fundamental rules of legal procedure." *Northern Securities Co.* v. *United States,* 193 U. S. 197, 344.

[19] If it were clear that there was a remedy in this civil antitrust suit that was not available in a § 411 proceeding before the C. A. B., we would have the kind of problem presented in *Hewitt-Robins Inc.* v. *Eastern Freight-Ways, Inc., ante,* p. 84, where litigation is held by a court until the basic facts and findings are first determined by the administrative agency, so that the judicial remedy, not available in the other proceeding, can be granted.   Nor is this a case where a proceeding before a second tribunal is desirable (*Thompson* v. *Magnolia Petroleum Co.,* 309 U. S. 478) or necessary (*General Am. Tank Car Corp.* v. *El Dorado Terminal Co.,* 308 U. S. 422; *Thompson* v. *Texas Mexican R. Co.,* 328 U. S. 134, 150–151) for an authoritative determination of a legal question controlling in the first tribunal.

Dismissal of antitrust suits, where an administrative remedy has superseded the judicial one, is the usual course.   See *United States Nav. Co.* v. *Cunard S. S. Co.,* 284 U. S. 474; *Far East Conference* v. *United States,* 342 U. S. 570, 577.