**BIG BEAR CARTAGE, INC., a corporation, Plaintiff,**

**v.**

**AIR CARGO, INC., a corporation, et al., Defendants.**

No. 75 C 2285.

United States District Court, N. D. Illinois, E. D.

Aug. 9, 1976.

Abraham A. Diamond, Ltd., Irwin D. Rozner, Chicago, Ill., for plaintiff.

M. Robert Sturman, Sturman, Sang & Carney, Chicago, Ill., for all defendants.

Russell S. Bernhard, Macleay, Lynch, Bernhard & Gregg, Washington, D. C., for Air Cargo, Inc.

Anthony R. Michel, Cleveland, Ohio, for Chicago Haulage, Inc.

## MEMORANDUM DECISION

MARSHALL, District Judge.

In this private antitrust action, the plaintiff Big Bear Cartage, Inc., charges that the defendants have combined and conspired to restrain interstate trade and commerce in the pickup and delivery of air freight to airline terminals in violation of 15 U.S.C. § 1 (1970). Jurisdiction exists under 28 U.S.C. §§ 1331, 1337. The defendants have answered and moved for summary judgment, alleging that because the Civil Aeronautics Board (Board) authorized and approved their activities, they are statutorily exempt from the operation of the antitrust laws. Federal Aviation Act of 1958, §§ 412, 414; 49 U.S.C. §§ 1382, 1384 (1970). The motion is ready for decision on the memoranda, affidavits and exhibits submitted by the parties.

A brief overview of the events leading to this dispute is in order. The Federal Aviation Act gives the Board comprehensive authority to regulate the airline industry. As part of the regulatory scheme, the Act requires Board approval of certain agreements to which an air carrier is a party. In particular, agreements which affect air transportation by establishing rates or by pooling traffic and services must be submitted to and approved by the Board. 49

U.S.C. § 1382(a).[1] The Act conditions Board approval upon a finding that the public interest will not be adversely affected. *Id.* § 1382(b). Some of the factors considered by the Board in making this determination are safety, economy, and the amount of competition needed to assure sound development of a national air transportation system. *Id.* § 1302. Once an air carrier obtains Board approval of an agreement, all persons necessarily affected by the approval order are exempt from antitrust liability for actions authorized by the order. *Id.* § 1384.[2]

The instant dispute emanates from an airline agreement to pool the ground services and facilities used in moving air freight to and from the airlines' terminals. Prior to 1947 each airline provided its own terminal facilities and air freight services, resulting in costly duplication. Defendants' Reply Memorandum, at 14. In 1947 all airlines then certified to operate in the United States designated the defendant Air Cargo, Inc. (ACI), their wholly owned corporation, as their common agent for establishing and maintaining a pickup and delivery service for air freight. This agreement authorized the ACI to coordinate ground facilities and to provide the needed connecting service directly or by contract with local truckers. The airlines filed their agreement, No. 1041, with the Board, which approved the proposed arrangement in Order E–1086.[3] The order specifically contemplated that ACI's activities would be undertaken as the airlines' agent. Defendants' Memorandum, App. 2, at 2. Further, the Board required ACI and its member airlines to submit copies of all service contracts with local carriers to the Board in the event that ACI contracted out the contemplated service.

Rather than provide the connecting ground service itself, ACI developed a standard cartage contract and used it to engage local carriers. Defendants' Memorandum, Clements Aff., at 7. From 1947 to 1962, all ACI service contracts followed the standard form and all were filed with and and approved by the Board. *Id.* at 8. In 1958 and 1960 some minor revisions were made in the standard form contract, although the substance remained unchanged. *Id.* Finally, in 1962, the Board terminated the filing requirement for contracts between the ACI and its local carriers. Since that time, the Board has supervised ACI's air freight service less directly, through its decisions to approve amendments to Agreement No. 1041. None of these changes in the basic

1. Section 1382(a) reads as follows:
    Every air carrier shall file with the Board a true copy, or, if oral, a true and complete memorandum, of every contract or agreement (whether enforceable by provisions for liquidated damages, penalties, bonds, or otherwise) affecting air transportation and in force on the effective date of this section or hereafter entered into, or any modification or cancellation thereof, between such air carrier and any other air carrier, foreign air carrier, or other carrier for pooling or apportioning earnings, losses, traffic, service, or equipment, or relating to the establishment of transportation rates, fares, charges, or classifications, or for preserving and improving safety, economy, and efficiency of operation, or for controlling, regulating, preventing, or otherwise eliminating destructive, oppressive, or wasteful competition, or for regulating stops, schedules, and character of service, or for other cooperative working arrangements.

2. Section 1384 reads as follows:
    Any person affected by any order made under sections 1378, 1379, or 1382 of this title shall be, and is hereby, relieved from the opera-

tions of the "antitrust laws", as designated in section 12 of Title 15, and of all other restraints or prohibitions made by, or imposed under, authority of law, insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order.

3. Although Order E–1086 is silent on this point, Order E–1930 indicates that the Board found the airlines' attempts to reduce costs by eliminating duplicated ground facilities to be in the public interest. Defendants' Memorandum, Exh. 4, at 2–3. The opinion accompanying Order E–1930 suggests that the Board carefully considered the effect of the proposed agreement upon competition within the airline industry, and found the anticompetitive impact outweighed by the resulting reduction in costs to the public. The order does not indicate if the Board considered whether the agreement would have an anticompetitive impact upon other industries, as, for example, the local carrier industry. In a later order, however, the Board has manifested a concern with preserving healthy competition between ACI and local independent carriers. See *Local Cartage Agreement Case*, 15 CAB 850, 854–55 (1952).

agreement materially concern the controversy here. *Id.* at 4–5. Additionally, the Board continues to scrutinize the reasonableness of the rates charged for air freight services through its review of airline tariffs. Hence Board surveillance and oversight of ACI activities continues, although the Board no longer individually reviews each service contract. See Defendants' Memorandum, Clements Aff., at 11.

The defendants in this action are the ACI, the entity which the airlines appointed as their agent in the 1947 agreement, and five local motor carriers with whom the ACI contracted to pick up and deliver air freight at O'Hare International Airport in Chicago. The plaintiff, another local trucking company, is independently engaged in the pickup and delivery of air freight.[4] In March of 1975, plaintiff contacted the ACI and requested that it be considered for an ACI cartage contract. ACI advised plaintiff that the existing service provided by the five defendant carriers for the Chicago area satisfied the airlines' current needs. In the event the airlines' requirements changed, ACI agreed to reconsider plaintiff's application at that time. Plaintiff subsequently filed this action.

In their motion for summary judgment, the defendants argue that under 49 U.S.C. §§ 1382, 1384, the Board's approval of Agreement No. 1041 and the amendments thereto immunizes them from antitrust liability. In essence, they contend that Agreement No. 1041 was an agreement between airlines and, as such, was properly filed with and approved by the Board pursuant to § 1382. Although the ACI and the five local carriers are not airlines within the meaning of the statute, they characterize their conduct as necessarily authorized and approved by the terms of the agreement and its amendments, and consequently, specifically immune from antitrust liability under § 1384. *Hughes Tool Co. v. Trans*

*World Airlines*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). Additionally, they argue that the Board's systematic approval of all local cartage contracts filed by ACI as the airlines' agent in the years 1947 to 1962 doubly immunizes their activities. Alternatively, the defendants argue that if their actions were not specifically approved and immunized by Board order, their actions were at least impliedly approved by virtue of the Board's consideration and acceptance of the 1947 agreement, and fifteen years of individual service contracts. Consequently, they ask that we apply the rule announced by the United States Supreme Court in *Carnation Co. v. Pacific Conference*, 383 U.S. 213, 932, 86 S.Ct. 781, 15 L.Ed.2d 709, 851 (1966). There, the Court held that if an activity is "arguably lawful", or arguably approved by Board order, then the federal courts should defer to the Board's regulatory jurisdiction.

The closeness of the fit between the defendants' conduct and the activity that the Board orders authorized and approved determines the disposition of the motion. Roughly speaking, four alternatives are presented. First, the conduct complained of may clearly be authorized by the Board order. In this event, the Act provides an immunity from antitrust liability and, accordingly, the complaint should be dismissed. *Hughes Tool, supra.* Second, although explicit Board approval is lacking, Board approval of other activities may imply approval of the questioned conduct. To avoid the possibility of conflict between the courts and the Board, we should initially defer to the Board and refrain from imposing antitrust sanctions upon conduct debatably approved by prior Board action. *Far East Conference v. United States*, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952); *United States Navigation Co., Inc. v. Cunard Steamship Co., Ltd.*, 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932). Under these cir-

---

4. The parties appear to agree that ACI controls about 20% of the market for air freight services. See Plaintiff's Memorandum at 9; Defendants' Reply Memorandum at 4. The remainder of air freight in the United States is shipped by air freight forwarders, manufactur-

ers in their own house trucks, and independent shippers like the plaintiff. The CAB recognizes the importance of the independent carrier to a competitive market in air freight. See Plaintiff's Memorandum at 2–3.

cumstances, we may either retain the case pending Board action, or dismiss it. *Carnation, supra.* Third, although no Board order confers either explicit or implied approval, the conduct complained of may involve the precise ingredients of matters specifically entrusted to the Board's authority under the Act. Then, the question of whether the transaction meets the Act's standard for competition is peculiarly for the Board, subject to the Act's provision for judicial review. *Pan American World Airways v. United States*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). Finally, if conduct is clearly *not* committed to the Board's regulatory jurisdiction and hence, could not be immunized by Board order, we may proceed to scrutinize it for antitrust violations. *Carnation, supra*, 383 U.S. at 221, 86 S.Ct. 781.

■ Before exploring these alternatives to determine which applies here, we take a brief look at the statutory scheme. Our starting point is the recognition that the Federal Aviation Act does not immunize the air transportation industry from all antitrust liability. Absent an unequivocal expression of congressional intent, the courts have traditionally been reluctant to find a complete repeal of the antitrust laws. *Pan American, supra*, 371 U.S. at 304–305, 83 S.Ct. 476. The Act, however, entrusts the Board with express authority over some specific antitrust problems in the airline industry. *Id.* at 304, 83 S.Ct. 476. Three sections in particular commit the supervi-

sion of certain potentially anticompetitive activities to the Board. Sections 1378 and 1379 give the Board authority over consolidations, mergers, purchases, leases, control acquisitions, and interlocking managements. Section 1382 explicitly gives the Board jurisdiction over pooling agreements like Agreement No. 1041. Moreover, under Section 1381, the Board has jurisdiction over unfair or deceptive practices and unfair methods of competition in air transportation and may initiate investigations into such matters, either upon its own motion or upon an air carrier's complaint. Finally, § 1384 immunizes persons affected by a Board order under §§ 1378, 1379, and 1382.

■ The proper standards for the Board to apply, in determining whether approval with its attendant immunity for conduct under these three sections is warranted, is that of the public interest. Section 1302[5] lists the several factors to be weighed in applying the public interest test. By thus providing the Board with standards distinct from those generally applicable under the antitrust laws, Congress indicated that the Board was not limited to approving only those transactions which pass muster under the antitrust laws. Although competition is still an important consideration, as evidenced by its inclusion in the factors affecting the public interest, it is significant only to the extent that it complements and aids the overall policy of the Act, which is to develop a sound air transportation system. See *Pan American, supra*, at 308–

---

5. The text of § 1302 provides:

In the exercise and performance of its powers and duties under this chapter, the Board shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity:

(a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the United States Postal Service, and of the national defense;

(b) The regulation of air transportation in such manner as to recognize and preserve the inherent advantages of, assure the highest degree of safety in, and foster sound economic conditions in, such transportation, and to im-

prove the relations between, and coordinate transportation by, air carriers;

(c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;

(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the United States Postal Service, and of the national defense;

(e) The promotion of safety in air commerce; and

(f) The promotion, encouragement, and development of civil aeronautics.

309, 83 S.Ct. 476; *cf. McLean Trucking Co. v. United States*, 321 U.S. 67, 84–86, 64 S.Ct. 370, 88 L.Ed. 544 (1944). The determination of whether a transaction within the Board's regulatory jurisdiction meets the Act's standard for healthy competition and is exempt from the antitrust laws is a question for the Board. Board decisions are, of course, subject to judicial review as provided in § 1486 of the Act. But the federal courts' role is limited to review. They are not to make the "public interest" determination in the first instance. *Pan American, supra*, 371 U.S. at 309, 83 S.Ct. 476.

We now consider the first alternative, or whether the defendants' conduct is specifically authorized by a Board order which immunizes it from antitrust liability. Two Supreme Court cases have construed the Act's immunity provision and have clarified the conditions under which it displaces the operation of the antitrust laws. The first of these is *Pan American World Airways v. United States*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). Studying the interplay of the Board's power to investigate under § 1381 and its authority to approve agreements under §§ 1378, 1379, and 1382, the Court held that requests for injunctive relief against conduct falling under these latter sections should be left to the Board, regardless of whether the Board had previously reviewed the activity.

The conduct challenged in *Pan American* was an alleged division of territories by an air carrier, Pan American, and a common carrier, Grace. Together these carriers formed Panagra, another airline. Then Pan American and Panagra agreed not to compete with each other in South America. Since the agreement dividing the South American market had never been submitted to the Board for its approval as required by § 1378(a), no immunity under § 1384 could be claimed. Nonetheless, because the division was precisely the subject of the Board's authority to allocate air routes and to allow affiliations between air carriers and common carriers, the Court held that the Board, exercising its investigatory power under § 1381, was the proper tribunal to review

the questionable conduct. Given its expertise, the regulatory agency was best suited to review the carriers' activities and to determine whether they harmonized with the special standard of public interest defined in the Act. If the federal judiciary were to intrude and to impose the policies and standards of the antitrust laws upon a regulated industry, conflicting decisions would result. 371 U.S. at 309–311, 83 S.Ct. 476.

Significantly, the Court held that the Board's express statutory authority over certain activities preempted the district court's jurisdiction, even though the Board had made no effort to investigate the alleged malfeasance for over 16 years. See *Hughes Tool Co. v. Trans World Airlines*, 409 U.S. 363, 408–409, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973) (discussing *Pan American*). Moreover, the Court brushed aside objections that the Board's § 1381 jurisdiction over unfair methods of competition in air transportation limited it to investigations of air carriers only, and not common carriers. If the Board had jurisdiction over corporate affiliations between common carriers and air carriers, the Court reasoned, it must have the authority to deal with the anticompetitive activities of both.

In summary, *Pan American* indicated that when the anticompetitive conduct involves a subject matter explicitly committed to Board jurisdiction, as under the three sections noted above, the Act's regulatory scheme demands that the courts leave the evaluation of the conduct's antitrust implications to the Board.

In 1973 the Court decided *Hughes Tool*, reaffirming the broad construction of the § 1384 immunity outlined in *Pan American*. In a series of orders, the Board had approved Toolco's gradual acquisition of the control of TWA. Toolco directly controlled TWA until 1960 when Toolco placed its TWA stock in a voting trust. *Trans World Airlines v. Hughes*, 332 F.2d 602, 606 (2d Cir. 1964). Within months, TWA filed suit against Toolco, alleging that Toolco's conduct as controlling shareholder in the years 1955–1960 violated the antitrust laws. In

particular, TWA complained that Toolco's control of the financing and timing of TWA's purchases of new aircraft was part of a conspiracy to restrain trade in the aircraft supply and manufacturing market. *Hughes Tool*, 409 U.S. at 403, 93 S.Ct. 647 (Burger, C. J., & Blackmun, J., dissenting). The Court, however, held that Toolco's actions were immune from antitrust liability, drawing upon *Pan American's* construction of the interplay of the statutory sections committing certain antitrust problems to Board jurisdiction and the concomitant antitrust immunity of § 1384.

Section 1378 requires Board approval before control of an airline is acquired. In 1944 the Board had authorized Toolco to acquire 46% of TWA's stock, finding the acquisition consistent with the public interest. But to ensure that Toolco would not abuse its power to TWA's disadvantage, the Board limited intercompany purchases to items of less than $200, not to amount to more than $10,000 per year. In 1950 the Board approved Toolco's virtually complete acquisition of TWA, subject to the same condition. As a result of these orders, "from 1944 through 1960, every acquisition or lease of aircraft by TWA from Toolco and each financing of TWA by Toolco required Board approval." 409 U.S. at 375, 93 S.Ct. at 655. Each proposed transaction was in fact approved by the Board as a modification of its original order approving Toolco's control of TWA. *Id.* at 375–76, 93 S.Ct. 647. Citing these instances of Board review and approval, the Court held that Toolco was immune from antitrust liability for the anticompetitive effects of its conduct.

The issue squarely presented by *Hughes Tool* was the scope of the antitrust exemption attaching to the activities approved by Board order. Under the statute, Board approval of control acquisitions is conditioned upon a consideration of whether the proposed merger will restrain competition or create a monopoly. §§ 1302(d), 1378. But to what markets does the Board's mandate to police anticompetitive and monopolistic

practices extend? Neither § 1378 nor the other sections under which a Board order will immunize against antitrust liability precisely define the relevant market. Nonetheless, the legislative history of the Federal Aviation Act, briefly sketched in the dissenting opinion, suggests that Congress gave the Board specific statutory responsibility over competition and monopoly in only one market, that of commercial air transportation. 409 U.S. at 402, 93 S.Ct. 647 (Burger, C. J., & Blackmun, Jr., dissenting).

Before the Act was passed, competition among air carriers had been destructively severe, threatening the collapse of the nation's fledgling air transportation industry. Congressional concern led to the passage of the Act, which substituted a regulatory scheme for the previously unsuccessful competitive market economy. As part of this scheme, a regulatory agency (the Board) was to administer the air carrier market in the public interest, striking a workable balance between competition and monopoly. To aid the Board in its task, it was given the power to immunize certain anticompetitive activities that might otherwise result in antitrust liability. *Id.* at 397–402, 93 S.Ct. 647. By choosing a scheme that combined regulation with immunity, Congress showed a willingness to trade a free market economy for the stability that regulation might bring to the air transportation industry. Although Congress did not specifically limit the Board's jurisdiction to anticompetitive practices in that industry, its focus was clearly upon the air transportation industry alone. *Id.* at 402, 93 S.Ct. 647. If the Board's substantive responsibility is limited to that industry, it follows that its power to immunize is similarly limited.

Defining the markets over which the Board may exert its regulatory power is important because a single act or practice may have antitrust implications in several markets. This was the case in *Hughes Tool.* Toolco's take-over of TWA and its daily business posed antitrust problems for the air transportation industry, and conse-

quently required Board approval under § 1378. Additionally, according to TWA's complaint, Toolco's control of TWA's aircraft purchases affected the aircraft supply and manufacturing market. TWA contended that although the Board approved the intercompany purchases, it did not sanction the manner in which Toolco used its position to monopolize the sizable segment of the aircraft supply market represented by TWA's needs. 409 U.S. at 379, 93 S.Ct. 647. The lower court accepted this distinction and held that the Board could not immunize anticompetitive effects in markets outside the Board's regulatory jurisdiction. *Id.* at 380, 93 S.Ct. 647. The Supreme Court reversed, forcefully rejecting the market characterization as determinative.

It adds nothing to the analysis to characterize Toolco's exercise of power over TWA as monopolization of the TWA market, for it was precisely such control that the Board opted for in 1944 and 1950. Moreover, a condition of the order was that Toolco's sales to TWA could not assume more than negligible proportions without in every instance the Board's approving the transaction as being consistent with the public interest. Nor does it add to the argument to describe Toolco's conduct as furthering a tying or exclusive-dealing arrangement or as a conspiracy to restrain trade in that market represented by TWA.

. . . . .

We by no means hold that the Federal Aviation Act completely displaces the antitrust laws. *Pan American*, 371 U.S., at 305 [83 S.Ct. 476, at 482, 9 L.Ed.2d 325]. But where, as here, the CAB authorizes control of an air carrier to be acquired by another person or corporation, and where the CAB specifically authorizes as in the public interest specific transactions between the parent and the subsidiary, the way in which that control is exercised in those precise situations is under the surveillance of the CAB, not in the hands of those who can invoke the sanctions of the antitrust laws.

409 U.S. at 388–89, 93 S.Ct. at 661.

■ The decision has troublesome implications, as the dissent eloquently notes. To absolve the parties of all antitrust liability, even in markets over which the Board has no statutory responsibility nor regulatory expertise [6] cuts against the basic tenet that implied repeals of the antitrust laws are disfavored. But the decision permits no other interpretation than that anticompetitive conduct, properly approved by the Board as in the public interest, is immune from liability despite antitrust consequences in markets outside the purview of the Act's administrative scheme.

■ Accepting this result, our task is to examine the defendants' conduct to determine whether it is exempt from antitrust liability under § 1384. The first step is to isolate a Board-approved agreement under § 1382. Two sets of agreements are available, the first of which consists of the standard form contracts entered into by ACI and the local carriers. Since 1962 when it terminated the filing requirement for contracts between ACI and its local carriers, the Board has not specifically approved the contracts under which the defendants currently operate. The contractual relationship between ACI and three of the local carrier defendants, however, predates 1962, and the original contracts between ACI and these parties were in fact approved by Board order in 1960. Defendants' Memorandum, Clements Aff., at 9.

Plaintiff, however, contends that the standard form contracts are not proper § 1382 agreements because no airline was a signatory. Plaintiff's interpretation of § 1382 as applying only to agreements to which an air carrier is a party is supported by the case law. *Breen Air Freight v. Air Cargo, Inc.*, 470 F.2d 767 (2d Cir. 1972), *cert. denied*, 411 U.S. 932, 93 S.Ct. 1901, 36 L.Ed.2d 392 (1973). Defendants contend, however, that ACI signed the contracts in its capacity as agent of the airlines, and,

6. Indeed, the Board itself perceives its competence as limited to the air transportation industry. See 409 U.S. at 409, 93 S.Ct. 647 (Burger, C. J., and Blackmun, J., dissenting).

consequently, that the airlines are principals to the agreements. To support their position the defendants point to the documents describing ACI's authority. The airlines' 1947 agreement to pool ground facilities and services specifically contemplates that ACI's activities as contractor would be undertaken on the airlines' behalf. Defendants' Memorandum, Exh. 1, ¶ 7. The Board sanctioned this arrangement, and in fact appeared to condition its approval of Agreement No. 1041 upon the airlines' representation that ACI would function only as an agent. *Id.* Exh. 2, at 2. Finally, the contracts themselves explicitly provide that ACI act as the airlines' agent. *Id.* Exh. 5, at 1.

Plaintiff, however, offers *Breen, supra,* as authority that ACI's contractual activities are not attributable to the airlines as principals. But ACI's actions in *Breen* are easily distinguishable from the actions questioned here. Two ACI agreements were challenged as antitrust violations in *Breen.* In the first, ACI joined with another company to form a third corporation, Ryd-Air, which was to provide cartage service in the New York City metropolitan area. In the second agreement, ACI contracted with the newly formed corporation and appointed it as ACI's exclusive cartage agent for the New York area. After careful consideration of the scope of Agreement No. 1041 and the Board order approving it, the Court of Appeals concluded that ACI's authority as the airlines' agent did not include "promoting a new corporation, owning stock in it, or sitting on its Board of Directors." 470 F.2d at 773. The court did not independently assess the status of ACI's actions in connection with the second agreement, stating that the two agreements were inseparable. *Id.*

In contrast to *Breen,* the ACI activities challenged here are clearly within the scope of ACI authority contemplated by the 1947 agreement and order: the provision of cartage service either directly or by contract. And, applying accepted principles of agency law, ACI's activities as agent are attributable to the airlines, who thus become parties to the contract. In short, the service contracts are authorized by an agreement to which an air carrier is a signatory, and qualify for the § 1384 immunity.

■ But regardless of whether the five service contracts challenged here qualify as § 1382 agreements, it is undeniable that they were not submitted to the Board because they were executed after 1962. Consequently, defendants cannot directly point to a Board order which explicitly approves and hence immunizes their conduct. A second possibility, however, is that applying the "arguably lawful" doctrine of *Far East Conference* and *Cunard, supra,* we could conclude that the Board's history of approving all standard form cartage contracts from 1947 to 1962, coupled with the Board's determination that further filing was unnecessary, implies Board approval with its attendant immunity for all subsequent standard form contracts. We need not reach this question, however, because the contracts between ACI and the five local carriers are not the only § 1382 agreements involved here.

The defendants also rely upon the Board order approving Agreement No. 1041. Unlike the local cartage contracts, which typically were of one year's duration, this agreement is still in effect,[7] as evidence by subsequent Board orders intermittently approving amendments to it. Hence, § 1384 may be invoked to immunize conduct authorized by the amended agreement, thus avoiding the need to imply an immunity from the Board's discontinued practice of reviewing local cartage contracts. Plaintiff does not dispute that Agreement No. 1041, as an agreement among air carriers, qualifies for the § 1384 immunity. Hence, our task is to isolate the activities authorized by Agreement No. 1041, and determine whether the conduct of which plaintiff complains was necessary to enable the defendants to "do anything authorized, approved, or required by such order." § 1384.

The agreement authorizes ACI to provide connecting air freight service and facilities,

---

7. See Defendants' Memorandum, Clements Aff., at 4.

either directly or by contract. Defendants' Memorandum Exh. 1, ¶ 7(b), (c), (d). In the event ACI elects to contract out the service, the agreement confers upon it the full power and authority to negotiate and execute local cartage contracts. *Id.* ¶ 7. Order E–1086 specifically approved as in the public interest the proposed use of ACI as the airlines agent to, *inter alia*, provide for ground cargo operations set out in the agreement and to arrange for common carriers to provide the connecting service. *Id.* Exh. 2, at 1. The Board also asserted its continuing jurisdiction over the ACI's activities under the agreement, noting that ACI's future development was uncertain and that its activities might require reconsideration of the approval granted by the order. *Id.* at 3. Thus, a fair reading of the agreement and the order lead to the inescapable conclusion that the airlines intended to delegate to the ACI full authority and discretion to provide the necessary air freight service, and that the Board approved the delegation subject to further consideration as it saw fit.

The gravamen of the plaintiff's complaint is that ACI rejected plaintiff's application to enter into a local cartage contract. Plaintiff characterizes ACI's refusal as an act in furtherance of a conspiracy to monopolize the pickup and delivery of air freight from airline terminals. Accepting as true plaintiff's theory of defendant's anticompetitive motive, the activity complained of—ACI's refusal to contract with plaintiff—is precisely contemplated by the 1947 agreement and order. Under the terms of the agreement, the airlines delegated to ACI the responsibility to coordinate the airlines' efforts in providing connecting air freight service to the end that costly duplication would be eliminated. To enable ACI to effectively carry out this responsibility, the airlines invested ACI with broad discretion to either provide the service itself or to contract it out. Exercising its judgment, ACI determined that the service currently offered by the five carrier

defendants was sufficient for the Chicago area. The plain language of the agreement contemplated precisely this sort of decision-making by ACI. As a result, the Board order approving the agreement immunizes ACI from antitrust liability for its refusal to contract with the plaintiff. Concomitantly, both ACI and the local carriers under contract to ACI are relieved from liability for their activities in performance of the local cartage contracts. *Air Freight Haulage of Puerto Rico, Inc. v. American Airlines, Inc.*, 414 F.Supp. 1043 (D.P.R., filed May 25, 1976); *Scroggins v. Air Cargo, Inc.* (N.D.Ga.1974), *affirmed*, 534 F.2d 1124 (5th Cir. 1976).

Because the statutory immunity is strictly limited to Board-approved actions and because federal courts have exclusive jurisdiction over federal antitrust law violations, we have reviewed the complaint for allegations of anticompetitive conduct beyond the scope of the 1947 agreement.[8] Such activities, of course, would not be immune. *Accord, Breen Air Freight, Ltd. v. Air Cargo, Inc.*, 470 F.2d 767 (2d Cir. 1972). None are apparent.

Finally we confront what we perceive to be plaintiff's argument that the antitrust violation alleged here, a conspiracy to monopolize the pickup and delivery of air freight from airline terminals, is outside the Board's jurisdiction, which is limited to the air transportation market. But as noted above, the Court's decision in *Hughes Tool Co. v. Trans World Airlines*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), seems to foreclose this attack. As long as we are faced with a pooling agreement within the terms of § 1382, properly approved by Board order, the immunity of § 1384 relieves the defendants of the fear of antitrust liability even though the approved actions have anticompetitive effects in markets outside the Board's statutory responsibility.

The papers submitted on the motion for summary judgment suggest that the Board's predominant concern in approving

---

8. Although in its brief opposing defendants' motion plaintiff contends that its complaint includes allegations along these lines, we could not find them.

the 1947 agreement was to assess its potential effect on competition among airlines in the air transportation industry. See CAB Order No. E–1930, in Defendants' Memorandum, Exh. 4, at 2–6. The Board has on occasion expressed its concern with the agreement's impact upon competition in other related markets. Specifically, the Board rejected a modification of the agreement which would have operated to favor the carriers engaged by ACI over independent carriers. *Local Cartage Agreement Case*, 15 CAB 850 (1952). This opinion clearly indicates that the Board seriously evaluates anticompetitive effects in other markets whenever these effects are brought to its attention. It is to similar collateral consequences in the same market that the instant complaint directs our attention. But although *Local Cartage* shows that the Board has been concerned in the past lest ACI abuse its authority, nothing in the papers here suggests that allegations have been made to the Board that ACI and certain of its carriers are using Agreement No. 1041 as a device for monopolizing air freight under the airlines' auspices.

We are mindful that the Supreme Court's function in such cases as *Hughes Tool* is to shape and guide the development of the law. Looking at that decision in this light, its overwhelming thrust is that the evaluation of collateral consequences of activities specifically sanctioned by Board approval is for the board and not the Court. 409 U.S. at 387–389, 93 S.Ct. 647; *Pan American World Airways v. United States*, 371 U.S. 296, 311–12, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). The Board surely contemplated that ACI would contract with only as many local carriers as ACI felt necessary to provide efficient service.[9] Consequently, an attempt to characterize ACI's refusal to contract as monopolization of the air freight market cannot negate the statutory

immunity.[10] Moreover, in an era when few important transactions have effects in a single market, the Court's liberal reading of the statutory immunity may be the only viable alternative if the immunity is to give meaningful protection to those who rely upon it. *Cf. NAACP v. Federal Power Commission*, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976) (Burger, C. J., concurring).

In conclusion, we find that the conduct challenged in the complaint was authorized and approved by Board Order E–1086. Accordingly, the conduct is immunized under § 414 of the Federal Aviation Act, 49 U.S.C. § 1384 (1970). The plaintiff's remedy is before the Board. The defendants' motion for summary judgment is granted. An order will enter dismissing the action.

---

9. The Board is cognizant that ACI has often engaged a single carrier for a given area. *Local Cartage, supra*, at 861–62. See Defendants' Memorandum, at 13.

10. *Cf.* 409 U.S. at 388, 93 S.Ct. 647. This decision is not to be interpreted as holding that

all collateral effects in any markets would always be immune from antitrust liability under *Hughes Tool.* But under the facts alleged here, we are confident that the philosophical approach outlined by the Court there requires a finding of immunity.